United States Court of Appeals,

Eleventh Circuit.

No. 95-3659.

Doug CAGLE, Adrian A. DeVogel, Guy Dickerson, Don Hopkins, Henry
Jenkins, Lenore Miller, as Trustees and Fiduciaries of the Retail,
Wholesale and Department Store International Union and Industry
Health and Benefit Fund, Plaintiffs-Counter-Defendants-Appellants,

v.

Nancy M. BRUNER, Defendant-Counter-Claimant-Cross-Defendant-
Appellee,

Memorial Hospital Jacksonville, Inc., Defendant-Counter-Claimant-
Cross Claimant-Third Party Plaintiff-Appellee,

University Medical Center, Inc., Movant-Appellee,

Cobbie L. Bruner, Sr., Third Party Defendant.

May 22, 1997.

Appeal from the United States District Court for the Middle
District of Florida. (No. 94-1015-Civ-J-16), John H. Moore, II,
Judge.

Before TJOFLAT, DUBINA and CARNES, Circuit Judges.

PER CURIAM:

In this appeal, we decide three issues relating to the
Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461
("ERISA"). First, we consider whether a plan beneficiary's
assignment of the right to payment of ERISA benefits to a health
care provider gives the health care provider standing to sue the
plan. We hold that it does, at least where the plan does not
forbid such an assignment.

Second, we consider whether an ERISA plan may require a plan
participant to sign a subrogation agreement before paying claims
submitted by that participant on behalf of a plan beneficiary. We
hold that the plan may do so, where the required subrogation

agreement does not contain an arbitrary and capricious interpretation of the plan's subrogation rights.

Finally, we consider an issue relating to the "make whole" doctrine of insurance law. Under the "make whole" doctrine, an insurer who pays less than an insured's total loss may not exercise a right of subrogation until the insured is "made whole" for his total loss. We address whether the "make whole" doctrine applies where an ERISA plan neither explicitly adopts nor disavows the doctrine. We conclude that the doctrine applies where the plan does not explicitly disavow it.

## I. BACKGROUND

A. FACTS

This action was brought by the trustees of the Retail, Wholesale and Department Store International Union and Industry Health and Benefit Fund. (We will refer to both the trustees and the fund as "the Fund"). The Fund was established pursuant to various collective bargaining agreements between employers and local unions affiliated with the Retail, Wholesale and Department Store International Union to provide benefits for plan participants and beneficiaries. The Fund provides an "employee benefit plan" governed by ERISA.

Nancy Bruner, a defendant in this action, is a plan participant by virtue of her employment with Swisher & Sons, a contributor to the Fund.[1] Bruner's son, Cobbie Bruner, Jr., is

---

[1]ERISA defines a plan participant to include:

> any employee or former employee of an employer, ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers

Bruner's dependent and a beneficiary of the Fund.[2]

On September 19, 1993, Cobbie Bruner, Jr. was involved in a car accident caused by a third party. Immediately after the accident, Cobbie Jr. received emergency treatment from University Medical Center. On October 18, 1993, Cobbie Jr. was transferred to Genesis Rehabilitation Hospital ("Genesis"), formerly Memorial Hospital of Jacksonville. Cobbie Jr. remained at Genesis for four months, and received outpatient treatment there for an additional four months. When Cobbie Jr. was admitted to Genesis, his father, Cobbie Bruner, Sr., signed a form assigning to Genesis his son's right to payment of medical benefits. Soon after Cobbie Jr.'s accident, the Fund paid an initial claim of $296.00 to Nancy Bruner for Cobbie Jr.'s medical treatment. Yet, approximately one month after Cobbie Jr. had been admitted to Genesis, the Fund refused to pay or process any additional claims for him until Nancy Bruner signed a standard subrogation form provided by the Fund. That agreement provides:

> I (we) understand that if payments are made under the Plan for any treatment or services because of injury to, or sickness of, an eligible individual who has a lawful claim, demand or right against a third party or parties (including an insurance carrier) for indemnification, damages or other payment with respect to such injury or sickness, I (we) am (are) required to subrogate to the RWDSU Health and Welfare Fund, the Plan, to the extent of payments made under said plan, my (our)

employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C.A. § 1002(7) (West Supp.1996).

[2]"The term "beneficiary' means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C.A. § 1002(8) (West Supp.1996).

rights to receive or claim such indemnification, damages or other payment.

In consideration thereof, if payments are made under said plan for treatment or service on account of the same injury or sickness and to the extent of such payments made (but not in excess of the proceeds of any recovery),

> (a) I (we) agree to reimburse the Plan in full from the proceeds of any recovery received by me (us) because of such injury or sickness, and

> (b) The Plan shall be subrogated in full to my (our) rights to such recovery and my (our) interest in the proceeds of such recovery;

if such recovery is based upon the eligible individual's lawful claim, demand or right against a third party or parties (including an insurance carrier).

Nancy Bruner signed the agreement sent by the Fund, but attached an addendum stating that the subrogation agreement does not "in any way expand the subrogation rights" of the Fund. The Fund rejected the amended agreement and sent Bruner an unmodified subrogation agreement to sign, promising to pay benefits if a signed unmodified version was returned. Bruner again returned the agreement with an addendum, stating that the subrogation agreement "does not, in any way, expand the subrogation rights of [the Fund] beyond the rights as provided in the [summary plan description]." That agreement was also rejected by the Fund. Bruner and Genesis threatened to sue the Fund for nonpayment.

B. PROCEDURAL HISTORY

The Fund filed this lawsuit in the Middle District of Florida pursuant to ERISA, 29 U.S.C. § 1132(a)(3) and 28 U.S.C. § 2201, seeking declaratory and injunctive relief. Naming both Nancy Bruner and Genesis as defendants, the Fund asked the district court to declare that Bruner was required to execute the plan's standard

subrogation agreement without modification as a condition precedent to the payment of Bruner's claims to Genesis. The Fund also requested that the district court issue an injunction ordering Bruner to execute the subrogation agreement.

Bruner counterclaimed against the Fund for: (1) a declaration that Cobbie Bruner is entitled under the plan to be made whole before the Fund may participate in any recovery from an at-fault party; (2) a judgment awarding Bruner an amount equal to the medical expenses covered by the Fund; and (3) attorney's fees and costs.

Genesis cross-claimed against Nancy Bruner for the amount of Cobbie Jr.'s medical bills and asserted four counterclaims against the Fund. Genesis claimed that the Fund had breached a contract with Genesis by denying payment to Genesis after the plan's precertification agent approved Cobbie Jr.'s stay. Second, Genesis claimed that the Fund had breached a contract with Genesis by refusing to pay benefits to which Genesis was entitled as an assignee. Third, Genesis claimed that the Fund had breached its fiduciary duty to Cobbie Jr. by refusing to accept Nancy Bruner's modified subrogation agreement and by refusing to pay Cobbie Jr.'s benefits. Finally, Genesis claimed entitlement to a declaration of its right to be paid by the Fund. The Fund answered Genesis' counterclaims with two affirmative defenses: (1) that Genesis lacks standing to sue the Fund under 29 U.S.C. § 1132(a); and (2) that Genesis' state law claims are preempted by ERISA.

All of the parties moved for summary judgment on the issue of whether the Fund could require Nancy Bruner to execute its standard

subrogation agreement before processing her claims. In its motion for summary judgment, the Fund also argued that Genesis did not have standing under ERISA, and that Genesis' state law claims were preempted by ERISA. The district court held that Genesis has standing to sue the Fund under 29 U.S.C. § 1132(a) as an assignee of Cobbie Jr.'s right to medical benefits. The district court also held that Genesis' state law claims are preempted by ERISA. On the requests for declaratory relief, the district court held that the Fund acted arbitrarily and capriciously in requiring Bruner to execute the subrogation agreement prior to processing her claims.

The district court granted Bruner's motion for summary judgment, including her request for a declaratory relief. The court denied the Fund's motion for summary judgment and granted summary judgment to Genesis on its claim for declaratory relief, but not on its damages claim. After a trial on damages, the court entered a judgment requiring the Fund to pay Genesis $56,744.57.

## II. DISCUSSION

Summary judgment may be granted only when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. This Court reviews *de novo* a district court's decision to grant or deny summary judgment. *E.g., United States v. Route 2, Box 472, 136 Acres More or Less,* 60 F.3d 1523, 1526 (11th Cir.1995).

## A. GENESIS' STANDING TO SUE THE PLAN

Before addressing the district court's grant of summary judgment, we must consider the Fund's argument that Genesis lacks standing to counterclaim against the Fund. According to the Fund,

the only parties that have standing to sue an ERISA plan, and thus to file counterclaims against it, are those listed in 29 U.S.C. § 1132(a): a "participant," "beneficiary," "fiduciary," or the Secretary of Labor. *See id.* Because Genesis does not fall within the definition of any of those terms, the Fund argues that Genesis is not allowed to bring an action or file a counterclaim against the Fund.

Genesis acknowledges that the list in § 1132(a) limits those parties who have independent standing to sue an ERISA plan. *See Hermann Hosp. v. MEBA Medical & Benefits Plan,* 845 F.2d 1286, 1289 (5th Cir.1988) (holding that parties not listed in § 1132(a) do not have independent standing to sue an ERISA plan). However, Genesis argues that § 1132(a)'s list of parties with standing does not bar Genesis from suing the plan, because Genesis is an assignee of rights held by an entity that is listed in § 1132(a). In other words, Genesis argues that when Congress listed those who could sue, it did not intend to alter the general rule that an assignee of a right has the same standing to sue as the assignor. Because Cobbie Jr. is a beneficiary of the plan, and the Bruners assigned to Genesis his right to receive payment of benefits, Genesis contends it may sue the Fund under § 1132(a).

The Fifth, Seventh, Eighth, and Ninth Circuits have held that an assignee of ERISA-covered medical benefits has derivative standing to bring an action under § 1132(a) against an ERISA plan, if the plan does not forbid assignments of benefits. *See Hermann,* 845 F.2d at 1289; *Kennedy v. Connecticut General Life Ins. Co.,* 924 F.2d 698, 700-01 (7th Cir.1991); *Lutheran Med. Ctr. v.*

*Contractors Health Plan,* 25 F.3d 616, 619 (8th Cir.1994); *Misic v. Building Serv. Employees Health and Welfare Trust,* 789 F.2d 1374, 1379 (9th Cir.1986). According to those courts, § 1132(a) does not preclude assignees from enforcing rights assigned to them by those listed in the statute as permissible plaintiffs. Only one circuit appears to diverge from that view, and it has done so only in dicta. In *Northeast Dept. ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d 147 (3d Cir.1985), a case which did not actually involve any assignment of benefits, the court stated that the list of possible plaintiffs in § 1132(a) is exclusive and, for that reason, assignees do not have standing to sue under that provision. *See id.* at 153-54 & n. 6.

Instead of following that dicta, we join our four sister circuits that have grappled with the issue in a case requiring its resolution. We hold that neither § 1132(a) nor any other ERISA provision prevents derivative standing based upon an assignment of rights from an entity listed in that subsection. As the Fifth Circuit has pointed out, neither the text of § 1132(a)(1)(B) nor any other ERISA provision forbids the assignment of health care benefits provided by an ERISA plan. *See Hermann,* 845 F.2d at 1289. The absence of any anti-assignment provision applicable to health care benefits takes on added significance in view of the fact that ERISA expressly prohibits the assignment of pension benefits governed by ERISA. *Id.; Misic,* 789 F.2d at 1376. We agree with the Fifth Circuit that the difference most likely exists because Congress recognized that "[a]n assignment to a health care provider facilitates rather than hampers the employee's receipt of health

benefits." *Hermann,* 845 F.2d at 1286.

Of course, an assignment will not facilitate a plan participant's or beneficiary's receipt of benefits if the plan does not pay the benefits it owes, and provider-assignees are not permitted to sue on the participant's or beneficiary's behalf. If provider-assignees cannot sue the ERISA plan for payment, they will bill the participant or beneficiary directly for the insured medical bills, and the participant or beneficiary will be required to bring suit against the benefit plan when claims go unpaid. *See Hermann,* 845 F.2d at n. 13. On the other hand, if provider-assignees can sue for payment of benefits, an assignment will transfer the burden of bringing suit from plan participants and beneficiaries, to "providers[, who] are better situated and financed to pursue an action for benefits owed for their services." *Id.* For these reasons, the interests of ERISA plan participants and beneficiaries are better served by allowing provider-assignees to sue ERISA plans.

The Fund contends that we should reject the majority view and its rationale because if we hold that Genesis has standing, it will necessarily follow that Nancy Bruner does not. Only one entity can wear Nancy Bruner's shoes, the argument goes, and in order to protect her rights, we should reject Genesis' claim of standing. Yet, we do not find Nancy Bruner's and Genesis' standing to be mutually exclusive, because Bruner and Genesis have distinct interests in this litigation. As an assignee, Genesis is concerned with being paid for Cobbie Jr.'s bills to the extent that the plan covers his treatment. Pursuant to that interest, Genesis has

counterclaimed against the Fund for damages and for a declaration that it is entitled to be paid immediately. Meanwhile, Nancy Bruner's primary concern in this case is whether the Fund's subrogation agreement expands the Fund's subrogation rights beyond the rights set forth in the benefits plan. That question is of little or no concern to Genesis, which has no claim against any damages that may be recovered from a third party.

The Fund also contends that we should not allow Genesis to have standing, because doing so will provide Genesis with an unfair advantage vis-a-vis other medical services providers that have treated Cobbie Jr. According to the Fund, the plan will not pay for all of Cobbie Jr.'s bills, and allowing Genesis to sue for nonpayment will upset the plan's carefully drafted procedures for paying all claims equitably. We see no reason why that must be true. By recognizing Genesis' standing, we are not deciding the amount Genesis is entitled to recover. We have not been asked to determine how much the Fund will pay Genesis or any other health care provider. All we decide is that Genesis, as a provider-assignee, has derivative standing to sue the Fund under 29 U.S.C. § 1132(a).[3]

B. THE FUND'S INTERPRETATION OF THE PLAN

We now consider whether the Fund may condition the payment of

---

[3]The Fund does not argue that the assignment of Cobbie Jr.'s right to payment of benefits to Genesis is invalid as a matter of contract law. Therefore, we need not decide what constitutes a valid assignment of medical benefits covered by ERISA.

We also decline to address the issue of whether a provider-assignee can sue an ERISA plan, where the terms of the plan forbid such an assignment. That situation is not before us in this case.

benefits on Nancy Bruner's execution of the Fund's subrogation agreement. Bruner urges us to affirm the district court's decision granting summary judgment in her favor on the ground that the subrogation agreement expands the Fund's subrogation rights beyond those set forth in the plan. In its argument for reversal, the Fund contends that it may condition the payment of benefits on the execution of the agreement, because the agreement is not an arbitrary interpretation of its subrogation rights under the plan.

1. *The Standard of Review of the Fund's Decision*

As an initial matter, we must decide the proper standard of review of the Fund's interpretation of the plan. The parties agree that this case should be treated as a denial-of-benefits case. In such a case, the Fund's (conditional) denial of ERISA benefits is subject to *de novo* review, unless "the benefit plan gives [the Fund] discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80 (1989); *Lee v. Blue Cross/Blue Shield of Alabama,* 10 F.3d 1547, 1549 (11th Cir.1994). If the plan reserves that discretion to the Fund, the arbitrary and capricious standard of review applies, *see Firestone,* 489 U.S. at 115, 109 S.Ct. at 956-57, unless the Fund's construction "would advance a conflicting interest of [the Fund] at the expense of the affected beneficiary." *Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1566-67 (11th Cir.1990). If such a conflict of interest is shown, the burden shifts to the Fund to demonstrate that its interpretation of the plan is not tainted by self-interest. *Lee,* 10 F.3d at 1552;

*Brown,* 898 F.2d at 1566.

Genesis claims that the Fund's decision creates a conflict of interest, but we agree with the district court that there is no conflict in this case. Conflicts arise when a fiduciary or administrator pays benefits to participants and beneficiaries from its own assets; an example is an insurance company administering an ERISA plan that the company also insures. *See Brown,* 898 F.2d at 1561. In that situation, the insurance company's role as administrator "lies in perpetual conflict with its profit-making role as a business." *Id.* In contrast, the Fund is a nonprofit entity, and benefits are paid out of a trust funded from the contributions of several employers. In such an arrangement, the Fund's decision to require a signed subrogation agreement merely protects the assets in the trust for other participants and beneficiaries. That requirement does not benefit the Fund (*i.e.,* the trustees) in any way which could create a conflict of interest at the expense of a plan participant or beneficiary.

Since there is no conflict of interest in this case, either the *de novo* or the arbitrary and capricious standard applies, depending upon whether the plan documents give the Fund sufficient discretion. The Fund argues that it is provided sufficient discretion to interpret the plan in the Trust Agreement and in the Rules and Regulations. In opposition, both Genesis and Bruner argue that the plan's Summary Plan Description ("SPD"), not other plan documents, must contain the discretionary language in order for the Fund to receive the deference required under the arbitrariness standard. We reject that argument. Both the Supreme

Court and this Court have reviewed trust documents and other non-SPD documents in the search for a reservation of discretion for plan administrators or fiduciaries. *See Firestone*, 489 U.S. at 109-13, 109 S.Ct. at 954-55; *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 39 (11th Cir.1989). *Accord Diaz v. Seafarers Int'l Union,* 13 F.3d 454, 457 (1st Cir.1994); *Luby v. Teamsters Health, Welfare and Pension Trust Funds,* 944 F.2d 1176, 1180-81 (3d Cir.1991). Accordingly, we look to all of the plan documents to determine whether the plan affords the Fund enough discretion to make the arbitrariness standard applicable.

In this plan, the Declaration of Trust and the Trust Rules and Regulations expressly reserve discretionary authority for the Fund on certain matters. The Declaration of Trust provides:

> Section 4. ELIGIBILITY REQUIREMENTS FOR BENEFITS. The Trustees shall have full authority to determine eligibility requirements for benefits and to adopt Rules and Regulations setting forth same which shall be binding on the Employees, their families and dependents.

> Section 5. METHOD OF PROVIDING BENEFITS. The benefits shall be provided and maintained by such means as the Trustees shall in their sole discretion determine....

Agreement and Declaration of Trust, Article VI. The Rules and Regulations state:

> The determination of any question arising in connection with the Plan, including (but not limited to) the interpretation of the terms of the Plan, shall rest with the Trustees, and their decision or action as to any such questions shall be final and conclusive, and binding upon the Employers and any Employee, Dependent or Beneficiary.

Retail, Wholesale and Department Store International Union and Industry Health and Benefit Fund Rules and Regulations, § 8.11.

We have held that reservations of "full and exclusive authority to determine all questions of coverage and eligibility"

along with "full power to construe the [ambiguous] provision[s]" of the plan reserve enough discretion to make the arbitrary and capricious standard applicable. *See Guy,* 877 F.2d at 39. The Declaration of Trust in this case reserves "full authority to determine eligibility requirements for benefits," while the Rules and Regulations reserve discretion in the Fund to interpret ambiguous sections of the plan. Consequently, the Fund's interpretations of the plan are subject to review under the arbitrary and capricious standard.

2. *Whether the Fund Acted Arbitrarily and Capriciously*

The Fund's right to subrogation arises out of the following language in the SPD:[4]

> Subrogation seeks to conserve the assets of the Benefit Fund by imposing the expense for accidental injuries suffered by members or eligible dependent's [sic] on those responsible for causing them. If you or one of your dependents, for example, should receive benefits from the Fund for injuries caused by someone else (such as an automobile accident,) the Benefit Fund through subrogation has the right to seek repayment from the other party or his insurance company, or in the event you or your dependent recovers the amount of medical expense paid by the Fund by suit, settlement or otherwise from any third person or his insurer, the Fund has the right to be reimbursed therefor through subrogation.

> The Benefits Fund will provide benefits to you and your dependents at the time of need, but you may be asked to execute documents or take such other action as is necessary to assure the rights of the Fund.

The Fund contends that this language enables it to require Bruner to sign its standard subrogation agreement before paying benefits.

---

[4]The parties agree that the SPD language is controlling on the issue of the Fund's subrogation rights; no other plan documents are cited by the parties on that specific issue.

The subrogation agreement provides in pertinent part:[5]

> I (we) agree to reimburse the Plan in full from the proceeds of any recovery received by me (us) because of such injury or sickness, and
>
> (b) The Plan shall be subrogated in full to my (our) rights to such recovery and my (our) interest in the proceeds of such recovery....

Under the arbitrary and capricious standard of review, we are limited to deciding whether the Fund's interpretation of the plan was made rationally and in good faith. *Blank v. Bethlehem Steel Corp.,* 926 F.2d 1090, 1093 (11th Cir.1991) (citing *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 39 (11th Cir.1989)). Factors relevant to that determination include: (1) the uniformity of the Fund's construction; (2) the reasonableness of its interpretation; and (3) possible concerns with the way unexpected costs may affect the future financial health of the Fund.[6] *See id.*

Bruner and Genesis challenge both the language of the subrogation agreement and the Fund's requirement that the agreement be signed before benefits are paid. Although the district court conflated the two issues in its analysis, we will analyze the issues separately.

a. *The Fund's subrogation rights*

---

[5]The entire text of the subrogation agreement is quoted in Section I.A. of this opinion.

[6]Other factors that may be relevant in reviewing a fiduciary or administrator's decision for arbitrariness are the internal consistency of a plan, the relevant regulations formulated by administrative agencies, and the factual background of the determination, including any inferences of bad faith. *Blank,* 926 F.2d at 1093. The parties do not argue that those factors are particularly relevant to this case, and we agree that they are not.

In deciding whether the Fund has acted arbitrarily and capriciously in choosing the particular language contained in the subrogation agreement, the district court was required to consider the uniformity of the Fund's interpretation. The Fund claims it has consistently interpreted the SPD to provide itself with a right of subrogation to any recovery obtained from an at-fault third party. The Fund's view is set forth in the standard subrogation agreement, and the Fund has never accepted any modified or amended form of that agreement. Bruner and Genesis failed to put forth any evidence that the Fund has ever interpreted the SPD to provide subrogation rights for the Fund that were narrower or in any way different from those set out in the standard subrogation agreement. Consequently, the uniformity factor indicates that the Fund's interpretation was not arbitrary and capricious.

Another factor the district court was required to consider in its review was whether the Fund's interpretation of the SPD's relevant language is reasonable. According to Bruner and Genesis, the SPD limits the Fund's subrogation rights to a recovery of "medical expenses" paid by a third party. By contrast, the Fund interprets the SPD to allow it to recover the medical expenses it has paid to a participant or beneficiary, out of any recovery achieved against the at-fault third party. While Bruner and Genesis' interpretation is plausible, the Fund's interpretation is more persuasive, because the SPD says the plan has a right of reimbursement in the event a participant recovers "the *amount* of medical expenses paid by the Fund" (emphasis added). The subrogation agreement is consistent with the SPD insofar as the

Fund's right to subrogation out of third-party recoveries is concerned.[7]

The district court thought that both the Fund's interpretation and the interpretation suggested by Genesis and Bruner were plausible. Faced with competing plausible interpretations, the district court construed all ambiguities in the SPD against the Fund and concluded that the Fund's interpretation was arbitrary. The district court erred in its "reasonable interpretation" analysis. The "reasonable interpretation" factor and the arbitrary and capricious standard of review would have little meaning if ambiguous language in an ERISA plan were construed against the

[7]We were recently confronted with the same issue—the consistency between a plan's SPD and its reimbursement agreement on the issue of the plan's reimbursement rights—in a case that did not require us to defer to the plan's interpretation, and we concluded that the provisions were not in conflict. *See Wright v. Aetna Life Ins. Co.,* 110 F.3d 762, 764-65 (11th Cir.1997). The SPD at issue in *Wright* gave the plan a right to be reimbursed out of any "damages" received by a plan participant from a third-party tortfeasor. *See id.* at 763 & n. 1. The plan's reimbursement agreement provided the plan with the right to be reimbursed out of any recovery from a third-party tortfeasor, to the extent such recovery was "attributable to" medical expenses paid by the plan. *See id.* at 763 & n. 2.

> Wright, the participant, settled with a third-party tortfeasor, and the settling parties allocated all of the damages to pain, suffering, and wage loss. *See id.* at 763-64. After Wright refused to reimburse the plan out of that recovery, the plan argued that the SPD and the reimbursement agreement were inconsistent, and that the SPD gave the plan a right to be reimbursed out of the participant's recovery. *See id.* We held that the SPD and the agreement were consistent; the agreement only interpreted the ambiguous language in the SPD. *See id.* at 764-65. We also held that the plan's reimbursement rights were controlled by the more specific reimbursement agreement, though not by the settling parties' "allocation" of damages in their settlement agreement. *See id.* at 765 & n. 3. We remanded the case so that the district court could determine what portion of the recovery was actually attributable to medical expenses paid by the plan. *See id.* at 764-65.

Fund.  If the Fund's interpretation is reasonable and is consistent with the law, then the reasonableness-of-interpretation factor militates against a conclusion that the Fund has acted arbitrarily and capriciously.

The third and final factor that the district court was required to consider was whether the Fund's interpretation was arbitrary and capricious in light of concerns about unexpected costs and the future financial stability of the Fund.  The Fund believes that trust assets will be endangered if the Fund's subrogation rights do not extend to any recovery obtained by plan participants and beneficiaries from third parties.  If the Fund is limited to subrogation of "medical expenses" recovered from the tortfeasor, plan participants and beneficiaries could destroy the Fund's subrogation rights by negotiating with the tortfeasor to label all or most of the damages received from the tortfeasor as "pain and suffering," even when they actually are intended to compensate for medical expenses.  The district court recognized that the Fund's concern was a genuine one, but it concluded that cost concerns were insufficient to overcome what the court perceived to be the "unreasonableness" of the Fund's interpretation, when all ambiguities were construed against the Fund.

Whether or not cost concerns can trump an *unreasonable* interpretation of plan language, the Fund's subrogation agreement advances a *reasonable* interpretation of the subrogation rights provided in the SPD.  Given the reasonableness of the Fund's interpretation, the uniformity of that interpretation, and the

genuine cost concerns that underlie it, we hold that the Fund did not act arbitrarily and capriciously in requiring Nancy Bruner to sign its subrogation agreement.

b. *Requiring the agreement to be signed before paying benefits*

Next, we consider whether it was arbitrary and capricious for the Fund to require that Nancy Bruner sign its standard subrogation agreement before paying benefits, instead of later. We turn again to the *Blank* factors (uniformity of interpretation, reasonableness of interpretation, and cost concerns) to determine whether the Fund's decision survives review under the arbitrary and capricious standard.

Nancy Bruner argues that the "uniform interpretation" factor weighs in her favor, because the Fund has been inconsistent about requiring a signed subrogation agreement prior to the payment of benefits. The Fund admits that it requires such an agreement before it pays benefits only when a large sum is at stake *and* the participant's or beneficiary's lawyers indicate that they may challenge the plan's subrogation rights. If only small sums are at issue, or if a large sum is at issue but the Fund is convinced that the participant's or beneficiary's lawyers will not object to the Fund's subrogation rights, no agreement is required.

According to Nancy Bruner, the fact that the Fund does not always require a signed subrogation agreement before paying benefits demonstrates that the Fund has inconsistently interpreted its right to insist upon the agreement being signed up-front. We disagree. The Fund's policy fully recognizes its right to insist upon a signed subrogation agreement as a prerequisite to receiving

benefits, but also withholds the exercise of that right in circumstances where it does not appear to be necessary to protect the Fund's assets. Here it did appear to be necessary, and the accuracy of that appearance was confirmed by Nancy Bruner's position in this litigation. Based on the evidence in the record, we conclude that the Fund has uniformly interpreted the plan to allow it to require a signed subrogation agreement before paying benefits, and the Fund has done so in circumstances like those in this case.

On the "reasonable interpretation" factor, the district court determined that the Fund unreasonably interpreted the plan to allow it to require a signed subrogation agreement prior to paying benefits. According to Bruner, the district court correctly found the Fund's position to be unreasonable, because the Fund has no right of subrogation until benefits are paid. We believe that Bruner is confusing the issues. It is true that because the Fund has no right of subrogation until the plan pays benefits, it cannot enforce the subrogation agreement until it pays benefits. Nevertheless, nothing in the plan forbids the Fund from requiring the agreement to be signed before it pays any claims. The SPD states that "[the participant or beneficiary] may be asked to execute documents or take such other action as is necessary to assure the rights of the Fund." That language can be read to require execution of the subrogation agreement before payment as easily as it can be read to require execution of the agreement after payment. Thus, the Fund's interpretation is not unreasonable, given the language of the plan.

When we consider the practical reasons for requiring the subrogation agreement to be signed before paying any benefits, the reasonableness of that policy becomes abundantly clear.  The Fund uses the subrogation agreements in negotiations with at-fault third parties.  Once benefits are paid, participants and beneficiaries have little incentive (other than the fear of a lawsuit) to sign a subrogation agreement.  If the Fund cannot require the agreement beforehand, it often will have to resort to lawsuits or at least the threat of lawsuits to obtain the agreements.  Lawsuits cost money, sometimes a lot of it.  In addition, delay becomes inevitable, and while the Fund is attempting to obtain the agreements from participants and beneficiaries, the Fund is hampered in its negotiations with at-fault third parties.  In short, having the agreement in hand before paying benefits provides significant protection to trust assets.  Cost concerns weigh in favor of the Fund's policy.

The *Blank* factors all weigh in the Fund's favor.  Accordingly, we conclude that the Fund has not acted arbitrarily or capriciously by requiring Nancy Bruner to sign its standard subrogation agreement as a condition to the processing and payment of claims for Cobbie Jr.

C. THE MAKE WHOLE RULE

The final issue we must decide is whether the "make whole" doctrine of insurance law applies to this case.  In Nancy Bruner's answer to the Fund's complaint, she counterclaimed for a declaration that the Fund has no right of subrogation with regard to Cobbie Jr.'s recoveries from third parties, unless and until

Cobbie Jr. is "made whole." The district court granted Nancy Bruner's motion for summary judgment in its entirety, and the Fund seeks a reversal of the "make whole" declaratory relief judgment Bruner obtained.

Under the "make whole" doctrine, "an insured who has settled with a third-party tortfeasor is liable to the insurer-subrogee only for the *excess* received over the total amount of his loss." *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 39 (11th Cir.1989). *See also* 16 *Couch on Insurance* § 61:64 (2d ed. 1983) (if an insurer pays less than the insured's total loss, the insurer cannot exercise a right of reimbursement or subrogation until the insured's entire loss has been compensated). State courts generally treat the "make whole" doctrine as a default rule that is read into insurance contracts, except where it is explicitly excluded. *See Fields v. Farmers Ins. Co., Inc.,* 18 F.3d 831, 835-36 (10th Cir.1994) (diversity case listing states that apply the make whole doctrine as a default rule).

According to the Fund, the "make whole" doctrine is a matter of state law, and it has no force in the ERISA context. To the extent that the Fund argues that this Court is not bound in ERISA cases by doctrines of state insurance law, the Fund is correct. But the Fund errs in claiming that the "make whole" doctrine is not part of the federal common law of this circuit. We recognized in the *Guy* case that the "make whole" doctrine applies in at least some ERISA cases.[8] *See Guy,* 877 F.2d at 39-40.

---

[8]*Guy* involved two claims for benefits submitted by an ERISA plan participant. The participant filed the first claim on behalf of his son, after his son was involved in an accident with

At most, the "make whole" doctrine operates as a default rule. *See Cutting v. Jerome Foods, Inc.,* 993 F.2d 1293, 1297 (7th Cir.1993) (describing the "make whole" doctrine as a "gap filler" and holding that it was not arbitrary for the plan to conclude it was not part of the ERISA plan); *Barnes v. Independent Auto. Dealers Ass'n,* 64 F.3d 1389, 1394 (9th Cir.1995) (applying the "make whole" doctrine as a default rule). *But see Sunbeam-Oster Co., Inc. Group Benefits Plan v. Whitehurst,* 102 F.3d 1368, 1378 (5th Cir.1996) (doubting whether court would adopt the "make whole" doctrine as a default rule) (dicta).[9] As a default rule, the "make

---

a third party. The plan paid eighty percent of the son's medical bills. The participant's ex-wife later sued the third-party tortfeasor in her individual capacity and as the next friend of her son, and the participant joined the suit in his individual capacity. The participant received $15,000 in a settlement with the tortfeasor. 877 F.2d at 37-39.

> The plan claimed it had a right of subrogation regarding the settlement recovery of the participant. The participant claimed the plan had no right to participate in that recovery, because the son's unpaid medical bills exceeded the amount recovered in the settlement. In other words, because the son had not been made whole, the participant argued that the plan's subrogation right was not mature. While this dispute was being litigated, the participant made an unrelated claim for benefits for his own medical care. The plan denied his claim on the ground that the participant owed the plan money for the benefits previously paid to the son. *Id.* at 38.

> We held in *Guy* that because the son had not been made whole by the settlement recovery, the plan's right to subrogation regarding that recovery was not mature. Accordingly, the plan's denial of benefits—which was based on the plan's view of its subrogation rights—was deemed to be arbitrary and capricious. *Id.* at 39.

[9]In *Sunbeam,* the Fifth Circuit concluded that the plan before it was not ambiguous on the issue of whether the plan could exercise its right of subrogation before a plan beneficiary was "made whole." *See* 102 F.3d at 1376. Because the plan was not ambiguous, the *Sunbeam* Court had no cause to decide whether the "make whole" doctrine should apply as a default rule in ERISA

whole" doctrine applies to limit a plan's subrogation rights where an insured has not received compensation for his total loss *and* the plan does not explicitly preclude operation of the doctrine. Although we did not describe the "make whole" doctrine as a default rule in *Guy,* our analysis in that case is consistent with the default rule view. *See* 877 F.2d at 39 (recognizing that there are possible exceptions to the "make whole" doctrine). We hold today that the "make whole" doctrine is a default rule in ERISA cases.

Because the "make whole" doctrine is a default rule, the parties can contract out of the doctrine. *Barnes,* 64 F.3d at 1395; *Cutting,* 993 F.2d at 1297. Indeed, the Fund contends that it has contracted out of the "make whole" doctrine in its benefits plan. In support of that argument, the Fund points to the plan's language, which gives the Fund:

> the right to seek repayment from the other party or his insurance company, or in the event you or your dependent recovers the amount of medical expense paid by the Fund by suit, settlement or otherwise from any third person or his insurer, ... the right to be reimbursed therefor through subrogation.

That language is standard subrogation language, which we think does not demonstrate a specific rejection of the "make whole" doctrine. *See Barnes,* 64 F.3d at 1395-96 (general subrogation language does not override "make whole" doctrine). *See also Guy,* 877 F.2d at 38-39 (applying the "make whole" doctrine even though the plan had a right to reimbursement from "all amounts recovered by suit, settlement or otherwise from any third person or his insurer to the

---

cases. *Id.* Nevertheless, the *Sunbeam* Court expressed without explanation its reservations about adopting the "make whole" doctrine as a default rule in ERISA cases. *Id.* at 1378.

extent of benefits provided hereunder").  An ERISA plan overrides the "make whole" doctrine only if it includes language "specifically allow[ing] the Plan the right of first reimbursement out of any recovery [the participant] was able to obtain even if [the participant] were not made whole."  *See Barnes,* 64 F.3d at 1395.

The Fund contends that specific language rejecting the "make whole" doctrine is not necessary where, as in this case, the Fund has discretion in interpreting the plan.  We recognize that in *Cutting v. Jerome Foods, Inc.,* 993 F.2d 1293 (7th Cir.1993), the Seventh Circuit held that where a plan did not specifically accept or reject the "make whole" doctrine, and the administrator had discretionary authority to interpret ambiguous language in the plan, it was not arbitrary for the administrator to conclude that the plan did not incorporate the "make whole" doctrine.  *Id.* at 1299.  We decline to follow *Cutting.*  In our *Guy* decision, we concluded that the "make whole" doctrine was applicable to a subrogation dispute even though the administrators of the plan had discretion to interpret the plan, and the administrators claimed the "make whole" doctrine was inapplicable. *See* 877 F.2d at 39-40.

We believe *Guy* reached the right result.  As we explained above, the "make whole" doctrine exists because parties to an insurance contract do not always explicitly address what happens when the insurer pays less than the insured's total loss, and the insured achieves a recovery from a third party.  The effect of the doctrine is to imply into ambiguous insurance contracts (including ERISA plans) a default provision governing that situation.  Either

the "make whole" doctrine is implied into the plan (the default scenario), or it is not (if there is clear language rejecting it). There is no interpretative question for the Fund to consider.

Under the *Cutting* approach, the Fund could avoid a default rule of insurance law applicable in the ERISA context merely by giving itself discretion to interpret the plan. We do not believe that ERISA gives the Fund that kind of authority, which is denied to insurance companies not governed by ERISA. Moreover, we think *Cutting* 's broad grant of discretion is unwarranted, because if the Fund wants to escape the "make whole" doctrine, it need only include language in the plan explicitly providing the Fund with the right to first recovery, even when a participant or beneficiary is not made whole. The Fund did not include such language in its plan. Therefore, the "make whole" doctrine applies to this case.

### III. CONCLUSION

We REVERSE the district court's grant of summary judgment to Genesis on its request for a declaration that the Fund must accept Bruner's modified subrogation agreement and process Genesis' claims thereafter. The Fund need not pay Genesis or Bruner until Bruner signs an unmodified, standard subrogation agreement. At that time, Genesis will have a right to receive payment for whatever the plan owes Cobbie Jr. for his treatment at Genesis.

We AFFIRM the district court's grant of summary judgment to Nancy Bruner on her request for a declaration that the Fund may not participate in any recovery from a third party until Cobbie Jr. is made whole. We REMAND to the district court for further proceedings consistent with this opinion.