[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10635
Non-Argument Calendar
_____

D.C. Docket No. 9:11-cv-80799-DTKH

SANCTUARY SURGICAL CENTRE, INC.,
GLADIOLUS SURGICAL CENTER, LLC,
PHYSICIANS SURGICAL GROUP, LLC,
NAPLES PHYSICIANS SURGICAL GROUP, LLC,
PSG OF S. FLORIDA, LLC,
PHYSICIANS SURGICAL GROUP OF BOCA RATON, LLC,

Plaintiffs - Appellants,

versus

AETNA INC.,

Defendant,

AETNA HEALTH, INC.,
AETNA LIFE INSURANCE COMPANY,

Defendants - Appellees.

_____

No. 13-10636
Non-Argument Calendar
_____

D.C. Docket No.  9:10-cv-81260-DTKH


SANCTUARY SURGICAL CENTRE, INC.,
GLADIOLOUS SURGICAL CENTER, LLC,

Plaintiffs - Appellants,

PHYSICIANS SURGICAL GROUP, LLC, et al.,

Plaintiffs,

versus

BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC.,

Defendant - Appellee.


_____

No. 13-10667
Non-Argument Calendar
_____

D.C. Docket No.  9:11-cv-80800-DTKH


SANCTUARY SURGICAL CENTRE, LLC,
GLADIOLUS SURGICAL CENTER, LLC,
PHYSICIANS SURGICAL GROUP, LLC,
NAPLES PHYSICIANS SURGICAL GROUP, LLC,
PSG OF S. FLORIDA, LLC,

2

PHYSICIANS SURGICAL GROUP OF BOCA RATON, LLC,

Plaintiffs - Appellants,

versus

CONNECTICUT GENERAL LIFE INSURANCE COMPANY, INC.,
CIGNA HEALTHCARE, INC.,
CIGNA HEALTHCARE OF FLORIDA, INC.,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(November 5, 2013)

Before CARNES, Chief Judge, TJOFLAT and MARTIN, Circuit Judges.

PER CURIAM:

The plaintiffs in this case sued various insurance plan administrators in four separate lawsuits that were consolidated in this appeal. The first suit was brought against several corporations affiliated with United Healthcare, the second suit was brought against three corporations affiliated with Aetna, the third suit was brought against Blue Cross and Blue Shield of Florida (Blue Cross), and the fourth suit was brought against three companies affiliated with Cigna. The plaintiffs asserted four claims in each complaint: failure to pay benefits under the terms of an insurance plan subject to Employee Retirement Income Security Act (ERISA)

3

§ 502(a)(1)(B), breach of fiduciary duty under ERISA § 502(a)(3), failure to provide plan documents under ERISA § 502(c), and equitable estoppel. The district court dismissed the plaintiffs' claims in each suit under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The plaintiffs, contending that they pleaded sufficient facts to state plausible claims, appeal that dismissal.[1]

## I.

The plaintiffs here consist of two groups of medical care providers — physician providers and medical facility providers. Beginning in 2004, they began performing medical procedures known as manipulations under anesthesia (MUAs) on patients covered under health insurance plans administered by the defendants.[2] Before performing those procedures the plaintiffs required each of their patients to sign a written agreement assigning their right to insurance benefits to the plaintiffs. The plaintiffs allege that the defendants originally paid them for the MUAs but later began denying those claims. While the complaints do not say when that change occurred, the exhibits attached to each complaint indicate that the denials began in 2006 and the plaintiffs continued to perform MUAs for which payment was denied by the defendants through 2009. The complaints allege that the defendants "generally denied the MUA claims on the basis that they were an

---

[1] The plaintiffs' appeal of the dismissal of their complaint against the United Healthcare defendants was dismissed by this court for lack of jurisdiction. Sanctuary Surgical Ctr., Inc. v. United Healthcare, Inc., No. 13-10634, slip op. 1 (11th Cir. May 15, 2013). Accordingly, those claims are not at issue here.

[2] The plaintiffs did not begin treating patients covered by Blue Cross plans until 2006.

unproven service, experimental, investigational, not medically necessary, or for not being a covered benefit or covered service under the relevant plan."

The plaintiffs' attempts to assert plausible claims rely on three broad factual allegations. The first is that the specific terms of each insurance plan in question provide for coverage of MUAs. Each complaint quotes isolated provisions from one to four group insurance plans administered by the defendants[3] to show that the plaintiffs are entitled to payment for the MUAs under all of the plans at issue. The quoted provisions state that the plans cover "medically necessary" procedures.

The plaintiffs attached exhibits to their complaints that list: (1) patient identification numbers, (2) group plan identification numbers, (3) medical conditions giving rise to MUA treatment for each patient, and (4) dates when the MUAs were performed. These exhibits show that the plaintiffs had performed MUAs to treat an array of conditions. They also show that the plaintiffs were seeking payment for procedures performed on 1,857 different patients: 347 covered by the Aetna defendants; 1,184 covered by Blue Cross; and 326 covered by the Cigna defendants. Finally, the exhibits indicate that many of those patients were covered under different group plans. The complaints, however, do not quote language from any of those other plans or contain copies of the other plans as

---

[3] The complaint against Blue Cross fails to quote any language from any Blue Cross plan. The complaint instead points to language from a plan administered by Carefirst and alleges, without support, that the Blue Cross plans are "consistent with" the Carefirst plan.

5

additional exhibits. Instead the complaints rest on the allegation that "[u]pon information and belief" all of those other plans contain language "consistent with" the one to four plans quoted in each complaint.

The second broad factual allegation set out in the complaints is that MUAs qualify as "medically necessary" procedures based on their inclusion in the American Medical Association's Codebook of Reimbursable Procedures. The complaints allege that the AMA recognizes that inclusion in the Codebook "is generally based upon the procedure being consistent with contemporary medical practice and the fact that it is being performed by many physicians in clinical practice in multiple locations." The complaints further allege that MUAs would not have been classified in the Codebook unless (1) they were "a distinctive service performed by many physicians/practitioners across the United States"; (2) "the clinical efficacy of MUAs [was] well established and documented in the United States peer review literature"; and (3) "the service/procedure has received approval from the Food and Drug Administration."

The plaintiffs' third general allegation concerns oral representations made by the defendants. Each complaint alleges that before performing MUAs on all 1,857 patients, the plaintiffs called representatives of the defendants to determine the scope of the patients' insurance coverage. The following topics were allegedly discussed in all 1,857 conversations:

6

the existence, nature and extent of the patient's out-of-network coverage; the patient's underlying medical condition which the patient's doctor believed necessitated the MUA; whether MUAs were covered services or benefits under the applicable insurance policy; the applicable co-payments and deductibles; pre-existing conditions; whether the patient had satisfied applicable authorization requirements for the MUA; and other issues concerning the patient's insurance coverage.

The defendants allegedly told the plaintiffs that the MUAs were covered.

## II.

We review de novo the district court's grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim. Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352, 1359 (11th Cir. 2011). We must accept the complaints' allegations as true and view them in the light most favorable to the plaintiffs. Id. "In assessing the sufficiency of the complaint[s'] allegations, we are bound to apply the pleading standard articulated in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937 (2009)." Id. The "allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint[s] are true (even if doubtful in fact)." Twombly, 550 U.S. at 555, 127 S.Ct. at 1965 (citation omitted). As a result, the plaintiffs must plead "a claim to relief that is plausible on its face." Id. at 570, 127 S.Ct. at 1974. "A claim has facial plausibility when the pleaded factual content allows the court to draw the

7

reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663, 129 S.Ct. at 1940.

## A.

The plaintiffs first argue that they have pleaded sufficient facts to make out a plausible claim under ERISA § 502(a)(1)(B), which allows participants and beneficiaries of a welfare benefit plan governed by ERISA, 29 U.S.C. §§ 1001 et seq., to bring civil suits to recover benefits or enforce rights to benefits under the terms of the plan. See 29 U.S.C. § 1132(a)(1)(B); Jones v. Am. Gen. Life & Acc. Ins. Co., 370 F.3d 1065, 1069 (11th Cir. 2004). We conclude that each complaint fails to state a claim under § 502(a)(1)(B) because the plaintiffs do not plead specific facts creating a plausible inference that the MUAs were medically necessary, and thus covered benefits, for each patient in question.

The primary factual support for the allegation that the MUAs were medically necessary is their inclusion in the AMA Codebook of Reimbursable Procedures. However, the Codebook does not support an inference that the MUAs were medically necessary for two reasons. First, the Codebook expressly states that "[i]nclusion in the . . . codebook does not represent endorsement . . . of any particular diagnostic or therapeutic procedure" and "[i]nclusion or exclusion of a procedure does not imply any health insurance coverage or reimbursement

policy."[4]    Second, even if the Codebook lacked those disclaimers, the only plausible inference that reliance on it would support is that MUAs are generally accepted procedures.    However, general acceptance is not the same thing as medical necessity for a particular patient.    Therefore the AMA Codebook fails to support the inference that the MUAs performed were medically necessary covered benefits.

Unable to rely on the AMA Codebook, the plaintiffs' ultimate undoing is their failure to allege specific facts showing that each MUA was medically necessary for the 1,857 patients and wide variety of ailments treated.    Without these specific facts the plaintiffs have not created a plausible inference that they were entitled to benefits.    The broad allegation that the plaintiffs received pre-approval from the defendants before performing the MUAs is also unhelpful.    It reveals nothing about how the defendants applied the "medical necessity" definition to deny each claim, and the plaintiffs instead rely on the scattershot allegation that the defendants "generally denied the MUA claims on the basis that they were an unproven service, experimental, investigational, not medically

---

[4] The plaintiffs' complaints neither quoted this specific language nor attached copies of the Codebook as exhibits.  Instead, the Aetna defendants included the Codebook pages with this language as an exhibit with their motion to dismiss.  Although we generally limit our review to the four corners of the complaint when reviewing a dismissal under Rule 12(b)(6), we may properly consider the Codebook language submitted by the Aetna defendants because the plaintiffs "refer[] to [those] documents in the complaint and those documents are central to the plaintiff[s'] claim."  See Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997).

necessary, or for not being a covered benefit or covered service under the relevant plan." The complaints also fail to allege any relevant facts to justify their assertion that the "medical necessity" definition should have been applied differently to permit coverage. Without this type of particularized showing, the plaintiffs have failed to plead sufficient facts supporting a plausible inference that they were entitled to benefits.

## B.

The plaintiffs assert two additional claims that turn on the issue of standing. The first is a claim for breach of fiduciary duty under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), based on the defendants' status as plan fiduciaries under 29 U.S.C. § 1002(21)(A). The second is a claim seeking civil penalties from the defendants for failure to provide plan documents to plan participants or beneficiaries as required by ERISA § 502(c), 29 U.S.C. § 1132(c).

The only parties with standing to sue a plan subject to ERISA under 29 U.S.C. § 1132 are "participant[s]," "beneficiar[ies]," "fiduciar[ies]," and the Secretary of Labor. 29 U.S.C. § 1132; Cagle v. Bruner, 112 F.3d 1510, 1514 (11th Cir. 1997). Healthcare providers fall outside this group. See Hobbs v. Blue Cross Blue Shield of Ala., 276 F.3d 1236, 1241 (11th Cir. 2001) ("Healthcare providers . . . generally are not considered 'beneficiaries' or 'participants' under ERISA."). Nevertheless, healthcare providers may obtain derivative standing by

10

securing an assignment of rights from a party with standing. <u>See</u> <u>Cagle</u>, 112 F.3d at 1514–15.

Assignment agreements are generally interpreted narrowly. For that reason, the right to bring suit under 29 U.S.C. § 1132 cannot be assigned "by implication or by operation of law." <u>See</u> <u>Tex. Life, Acc. Health & Hosp. Serv. Ins. Guar.</u> <u>Ass'n v. Gaylord Entm't Co.</u>, 105 F.3d 210, 218–19 (5th Cir. 1997) (holding that association did not have derivative standing to bring a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(2) because there was no evidence that the right to bring a breach of fiduciary duty claim had been "expressly and knowingly assigned"); <u>see</u> <u>also</u> Restatement (Second) of Contracts § 324 (1981) ("It is essential to an assignment of a right that the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee."). Instead, the assignment must be "express and knowing." <u>Tex. Life</u>, 105 F.3d at 218. Accordingly, the scope of an assignment cannot exceed the terms of the assignment agreement itself. <u>See</u> <u>id.</u>

The plaintiffs contend that they have standing to assert claims under § 502(a)(3) and § 502(c) based on the assignment agreements they entered into with each patient. The agreements provide:

> I understand that I am responsible for all charges. As a courtesy, my insurance will be billed for me. It is my responsibility to pay any deductible, copay or any other balance not paid for by my insurance

11

company. I authorize insurance benefits to be paid directly to the provider.

By signing below, I acknowledge that I authorize payment to [Plaintiff] . . . I have been presented with a copy of the Notice of Privacy Policy . . . I understand the contents of the Notice. I request medical insurance benefits either to myself, or to the party who accepts assignment. Regulations pertaining to medical assignment of benefits apply.

(emphasis added). The plaintiffs' contention stretches beyond its breaking point the plain meaning of the agreement, which assigns only the right to receive benefits and not the right to assert claims for breach of fiduciary duty or civil penalties. Because the agreements do not support the plaintiffs' position, they lack standing to bring claims under § 502(a)(3) and § 502(c).

C.

The plaintiffs' final claim is based on an equitable estoppel theory. We have recognized equitable estoppel as an additional remedial road beyond the remedy paths explicitly authorized under ERISA § 502(a). Jones, 370 F.3d at 1069. However, this alternative route is "very narrow." Id. It is only open to a plaintiff who can show that (1) "the relevant provisions of the plan at issue are ambiguous," and (2) "the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of the ambiguity." Id. "[A]mbiguity exists if the policy is susceptible to two or more reasonable interpretations that can fairly be made, and one of these interpretations results in coverage while the other

results in exclusion." Tippitt v. Reliance Standard Life Ins. Co., 457 F.3d 1227, 1235 (11th Cir. 2006) (quotation marks omitted).  Equitable estoppel may not be relied upon to "enlarge or extend the coverage specified in a contract."  Kane v. Aetna Life Ins., 893 F.2d 1283, 1285 n.3 (11th Cir. 1990).

The plaintiffs rest their equitable estoppel argument on the allegation that the terms "medically necessary" and "covered service" are ambiguous under the plans. We note at the outset that this argument fails with respect to Defendant Blue Cross. The plaintiffs' complaint against Blue Cross points only to language in a plan issued by Carefirst, not Blue Cross, to support the plaintiffs' position that the terms of the Blue Cross plans were ambiguous.  Coupling language from a non-Blue Cross plan with the conclusory allegation that similar, yet unidentified, language exists in the Blue Cross plans is insufficient to move the plaintiffs' equitable estoppel claim against Blue Cross beyond the "speculative level."  Twombly, 550 U.S. at 555, 127 S.Ct. at 1965 (citation omitted).  This conclusion holds for all of the plaintiffs' claims based on insurance plans that were not specifically quoted in the complaints.  Without pointing to specific plan language that is ambiguous, the plaintiffs' equitable estoppel claims under those plans are speculative at best.

With respect to the plaintiffs' claims against the Aetna and Cigna defendants, we may examine the plans specifically mentioned in the complaints to determine whether the plaintiffs have pleaded sufficient facts to establish a

13

plausible claim of equitable estoppel for those plans. While the plaintiffs only quoted selected portions of three Aetna plans and four Cigna plans in their complaints, our review to determine ambiguity in those plans is not limited to those isolated paragraphs. Instead, to assess for ambiguity we may review the broader portions of the plans that the defendants included in their motions to dismiss. See Speaker v. Dep't of Health & Human Servs., 623 F.3d 1371, 1379 (11th Cir. 2010) (noting that a court "may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged"). It is well-established that if these plans "contradict the general and conclusory allegations of the pleading[s], the [plans] govern." Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1206 (11th Cir. 2007).

Our review of the plans leads us to conclude that the terms "medically necessary" and "covered service" are not ambiguous. They are unambiguous because each plan contains an extensive definition of the terms. For example, a representative Aetna plan includes the following definition of "medically necessary":

To be Medically Necessary, the service or supply must:

- be care or treatment as likely to produce a significant positive outcome as, and no more likely to produce a negative outcome than, any alternative service or supply, both as to the disease or injury involved and the Member's overall health condition;

14

- be care or services related to diagnosis or treatment of an existing illness or injury, except for covered periodic health evaluations and preventive and well baby care, as determined by HMO;

- be a diagnostic procedure, indicated by the health status of the Member and be as likely to result in information that could affect the course of treatment as, and no more likely to produce a negative outcome than, any alternative service or supply, both as to the disease or injury involved and the Member's overall health condition;

- include only those services and supplies that cannot be safely and satisfactorily provided at home, in a Physician's office, on an outpatient basis, or in any facility other than a Hospital, when used in relation to inpatient Hospital Services; and

- as to diagnosis, care and treatment be no more costly (taking into account all health expenses incurred in connection with the service or supply) than any equally effective service or supply in meeting the above tests.

The plan further provides who will make the "medical necessity" determination and what information that person will consider:

> In determining if a service or supply is Medically Necessary, HMO's Patient Management Medical Director or its Physician designee will consider:
>
> - information provided on the Member's health status;
> - reports in peer reviewed medical literature;
> - reports and guidelines published by nationally recognized health care organizations that include supporting scientific data;
> - professional standards of safety and effectiveness which are generally recognized in the United States for diagnosis, care or treatment;
> - the opinion of Health Professionals in the generally recognized health specialty involved;

15

- the opinion of the attending Physicians, which have credence but do not overrule contrary opinions; and
- any other relevant information brought to the HMO's attention.

The Cigna plans contain a similarly extensive definition of the term "medically necessary covered services." For example, one Cigna plan outlines the following:

Medically Necessary Covered Services and Supplies are those determined by the Medical Director to be:

- required to diagnose or treat an illness, injury, disease or its symptoms;
- in accordance with generally accepted standards of medical practice;
- clinically appropriate in terms of type, frequency, extent, site and duration;
- not primarily for the convenience of the patient, Physician or other health care provider; and
- rendered in the least intensive setting that is appropriate for the delivery of the services and supplies. Where applicable, the Medical Director may compare the cost-effectiveness of alternative services, settings or supplies when determining least intensive setting.

Given these extensive definitions, the terms are not ambiguous. See Katz v. Comprehensive Plan of Grp. Ins., 197 F.3d 1084, 1086 n.8, 1090 (11th Cir. 1999) (holding that the term "active service" was unambiguous when insurance plan defined the term); cf. Dahl-Eimers v. Mut. of Omaha Life Ins. Co., 986 F.2d 1379, 1382 (11th Cir. 1993) (holding that the phrase "considered experimental" was ambiguous where the plan did not "indicate who will determine whether a proposed treatment is considered experimental" and did not contain "standards for

16

how that determination will be made). Because the terms of the plans were unambiguous, the plaintiffs' equitable estoppel claims necessarily fail.

### III.

For the reasons discussed above, the plaintiffs did not state a plausible claim for relief and the district court properly dismissed their claims.

**AFFIRMED.**