Carol VICKERS, Plaintiff,

v.

GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, Defendant.

No. 6:01CV1264–Orl–31DAB.

United States District Court, M.D. Florida, Orlando Division.

April 25, 2002.

Eugene W. Harris, Harris & Gonzalez, Lakeland, FL, for Plaintiff.

Harold E. Patricoff, Shutts & Bowen, LLP, Miami, FL, for Defendant.

## ORDER

PRESNELL, District Judge.

This Court has for its consideration Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 15), Plaintiff's Cross Motion for Summary Judgment (Doc. 23) and Supplement (Doc. 30), Defendant's Opposition to Plaintiff's Cross Motion for Summary Judgment (Doc. 27), Defendant's Supplemental Affidavit (Doc. 33), and Plaintiff's Response, thereto (Doc. 34). The Court heard oral argument on the Cross Motions for Summary Judgment on March 28, 2002. The Court has carefully considered the motions and responses including the accompanying memoranda and exhibits, the arguments of counsel, and is otherwise fully advised in the premises.

## I. INTRODUCTION

This is an action for death benefits by Carol Vickers ("Ms.Vickers"), the beneficiary under her son's group life insurance policy.[1] Ms. Vicker's son, Shaun Vickers, was employed as an electrician's helper with Amber Electric ("Amber").

## II. FACTS

Amber maintained a group life, health, and accidental death insurance plan for its full-time employees through Guardian Life Insurance Company of America ("Guardian"). Amber's group insurance plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (Doc. 15, Def. Mot. Summ. J. at Exh. 3, p. 71–72). Guardian, a mutual fund company, administrates the plan, collects premiums, and decides which claims to pay or deny. (*Id.* at 72).

In Amber's application for a group policy, Amber indicated that it wished to provide insurance to two groups of employees: 1) officers and managers; and 2) employees who worked at least thirty hours per week. (*Id.* at Exh. 1). For this second group of employees, the life insurance would equal their base annual earnings, rounded to the next higher $1,000.00. (*Id.* at Exh. 1; Exh. 4, p. 17). The policy also provided for a ninety-day waiting period for this second group of employees. (*Id.* at Exh. 2).

Shaun Vickers began work with Amber on July 31, 2000. Accordingly, his life insurance coverage was scheduled to begin on Sunday, October 29, 2000 at 12:01 a.m.

---

1. At the hearing, both parties conceded that there were no material issues of disputed fact.

On October 20, 2000, Shaun completed a group insurance enrollment form, as required by Guardian. On the enrollment form, Shaun indicated that he normally worked forty hours each week. (*Id.* at Exh. 5).

On Wednesday, October 25, 2000, Shaun worked 8 and 1/2 hours for Amber.[2] That evening, Shaun was seriously injured in an accident, which required his hospitalization. The following morning, prior to the start of the work day, Michael Freiner, Amber's Vice President, removed Shaun from the work schedule for Thursday and Friday. Shaun died on Sunday, October 29, 2000 at 1:01 a.m.

Subsequently, Ms. Vickers made a claim for benefits under Amber's group policy.[3] As part of the claim procedure, Guardian requested information about Shaun from Amber. (*Id.* at Exh. 6). On the form, Janice Becknell, the Human Resource Manager for Amber, indicated that Shaun's annual salary was $17,680.00. (*Id.*). The form also asked for the "date [Shaun] last worked full time" and the "[Shaun's] schedule at time last worked." (*Id.*). Becknell wrote October 25th as the last day worked and indicated that Shaun's schedule was 8 hours per day, 5 days per week. (*Id.*). Finally, Becknell recommended that Guardian pay the claim. (*Id.*).

Guardian, however, declined to pay the claim. Ms. Vickers filed suit in state court against Guardian. Guardian subsequently removed the case to this Court.

## III. STANDARD OF REVIEW

A party is entitled to judgment as a matter of law when the party can show that there is no genuine issue as to any material fact. Fed. R. Civ. Pro. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Id.* at 323, 106 S.Ct. 2548. In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the record presents factual issues, the court must not decide them, but rather, must deny the motion and proceed to trial. *Environmental Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir.1981).[4]

## IV. ANALYSIS

### A. Standard of Review for ERISA Claims

The Eleventh Circuit "has adopted the following standards for reviewing administrators' plan interpretations: (1) de novo where the plan does not grant the admin-

---

**2.** Between Monday and Wednesday, Shaun worked 27 hours.

**3.** Originally, Ms. Vickers made a claim as beneficiary for both the life insurance and the accidental death coverage. However, Ms. Vickers subsequently conceded that under the

terms of the policy, she was not entitled to the funds from the accidental death coverage.

**4.** All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

istrator discretion[;] (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir.2001) (quoting *Buckley v. Metropolitan Life,* 115 F.3d 936, 939 (11th Cir.1997) (emphasis omitted); *see also Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321 (11th Cir.2001). When a court reviews a claims administrator's benefits determination, the court must follows a series of steps. *Id.* At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry. *Id.*

First, a court begins by looking at the plan documents to determine whether the plan documents grant the claims administrator discretion to interpret disputed terms. *Id.* If so, then the court applies arbitrary and capricious review and possibly heightened arbitrary and capricious review. *Id.* Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court must evaluate the claims administrator's interpretation of the plan to determine whether it is "wrong." *Id.* (citing *Godfrey v. BellSouth Telecommunications, Inc.,* 89 F.3d 755, 758 (11th Cir.1996); *Brown v. Blue Cross & Blue Shield of Ala., Inc.,* 898 F.2d 1556, 1566 n. 12 (11th Cir.1990) ("[i]t is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary.")). "Wrong" is the label used to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms de novo, the court disagrees with the claims administrator's plan interpretation. *Id.* at 993–94 (citing *Yochum v. Barnett Banks, Inc.,* 234 F.3d 541 (11th Cir.2000); *Marecek v. BellSouth*

*Telecommunications, Inc.,* 49 F.3d 702, 705 (11th Cir.1995) (explaining a court must decide if the administrator correctly interpreted the plan); *Brown,* 898 F.2d at 1566 n. 12 (citations omitted) (explaining that the first step in application of arbitrary and capricious standard is determining legally correct interpretation of disputed plan provision)). If the district court agrees with the ultimate decision of the administrator, it will not decide whether a conflict exists. *Id.* at 993–94 & n. 23 (citing *Marecek,* 49 F.3d at 705). Only when the court disagrees with the decision, i.e. the decision is wrong, does it look for a conflict and, when it finds such a conflict, it reconsiders the decision in light of this conflict. *Id.*

If the court determines that the claims administrator's interpretation is "wrong," the court then proceeds to decide whether "the claimant has proposed a 'reasonable' interpretation of the plan." *Id.* at 994 (citing *Lee v. Blue Cross/Blue Shield of Ala.,* 10 F.3d 1547, 1550 (11th Cir.1994)). When an ERISA plan is ambiguous, the principle of *contra proferentem* requires that ambiguities be construed against the drafter of a document; as such, the claimant's interpretation is viewed as correct. *Lee,* 10 F.3d at 1551; *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/ Blue Shield of Ala.,* 41 F.3d 1476, 1481 n. 4 (11th Cir.1995). However, even if the court determines that the claimant's interpretation is reasonable, the claimant does not necessarily prevail because the plan documents explicitly grant the claims administrator discretion to interpret the plan and the administrator is entitled to the benefit of its contractual bargain. *Id.* (footnote omitted) (citing *Brown,* 898 F.2d at 1563). Therefore, to find a claims administrator's interpretation arbitrary and capricious, the court must overcome the principle of trust law which states that a trustee's interpretation will not be disturbed if it is reasonable. *Id.* (citations and footnote omitted).

Thus, the next step requires the court to determine whether the claims administrator's wrong interpretation is nonetheless reasonable. *Id.* If the court determines that the claims administrator's wrong interpretation is reasonable, then this wrong but reasonable interpretation is entitled to deference, unless the claims administrator suffers from a conflict of interest. *Id.* Therefore, the next step in the analysis requires the court to gauge the self-interest of the claims administrator. *Id.* If no conflict of interest exists, then only arbitrary and capricious review applies and the claims administrator's wrong but reasonable decision will be upheld. *Id.* (citing *Lee,* 10 F.3d at 1550).

If a conflict of interest does exist, then heightened arbitrary and capricious review applies. *Id.* In applying heightened arbitrary and capricious review, the court follows the same steps that constitute arbitrary and capricious review, but given the claims administrator's self interest, it continues the inquiry. *Id.* Under the heightened arbitrary and capricious standard of review, the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest.[5] *Id.*

## B. Application of the ERISA Standard to Guardian's Denial of Benefits

Here, the group plan gives Guardian the right to make all claim determinations and

"construe the terms of the plan with respect to claims." (Doc. 15, Exh. 3 at 72). Therefore, at a minimum, this Court must apply the arbitrary and capricious standard of review to Guardian's decision to deny coverage.

In support of its denial of coverage, Guardian asserts that Shaun's last regularly scheduled work day was Friday, October 27, 2000 because Shaun was originally scheduled to work Monday though Friday each week. Therefore, Guardian claims that Shaun's coverage never took effect because he was unable to work on Friday, October 27th. In response, Ms. Vickers contends that Wednesday, October 25, 2000 was Shaun's last regularly scheduled work day. Thus, Ms. Vickers asserts that Shaun worked his last regularly scheduled work day as required under the policy and she is entitled to recover under the policy. Guardian replies that the change in Shaun's schedule was a revised schedule, not the regular schedule. Guardian further asserts that the insurance coverage never took effect because the change was made as a result of the accident.[6]

Both the policy (*Id.* at Exh. 3) and the employee coverage information (*Id.* at Exh. 4), contain sections explaining when coverage begins.[7] The policy states in relevant part:

5. The claims administrator satisfies this burden by showing that its wrong but reasonable interpretation of the plan benefits the class of participants and beneficiaries. *HCA,* 240 F.3d at 995 (citing *Brown,* 898 F.2d at 1568).

6. Guardian admitted that if the schedule had been changed by Amber to accommodate customer or business needs, then coverage would have taken effect on October 29th.

7. The employee coverage information reads, [Y]ou must be actively at work on a *full-time* basis on the scheduled effective date or

dates. And you must have met all of the applicable conditions explained above, and any applicable waiting period. If you are not actively at work on any date part of your insurance is scheduled to start, we will postpone that part of your coverage until the date you return to active *full-time* work.

Sometimes, the effective date shown on the sticker or in the endorsement is not a regularly scheduled work day. But coverage will start on that date if you were actively at work on a *full-time* basis on your last regularly scheduled work day.

(Id. at Exh. 4, p. 15) (emphasis in original).

An employee must be actively at work, and working his regular number of hours, on the date his coverage is scheduled to start. And he must have met all of the conditions of eligibility which apply to him. If an employee is not actively at work on his scheduled effective date, we will postpone the start of his coverage until he returns to active work.

Sometimes, a scheduled effective date is not a regularly scheduled work day. But an employee's coverage will start on that date if he was actively at work and working his regular number of hours, on his last regularly scheduled work day. (*Id.* at Exh. 3, p. 27). Further, the policy contains a definition section which indicates that " 'Full-time' means the employee regularly works at least the number of hours in the normal work week set by the employer (but not less than 30 hours per week), at his employer's place of business." (*Id.* at 29).

Ms. Vickers and Guardian agree that because Shaun's scheduled effective date was Sunday, October 29, 2000, the second paragraph of both the policy and the employee coverage information is controlling. Furthermore, both agree that the question for this Court is whether Shaun's last regularly scheduled work day was Friday or Wednesday under the language of the policy.

After reviewing the plan de novo, this Court finds that the language in question is susceptible to differing interpretations, and therefore, is ambiguous. *See Dahl–Eimers v. Mutual of Omaha Life Ins. Co.,* 986 F.2d 1379 (11th Cir.1993) (when one interpretation of a provision results in coverage and another results in exclusion, ambiguity exists in the insurance policy especially when a particular term or terms are not defined) (citations omitted). Furthermore, the rule of *contra proferentem* requires that ambiguities be construed against Guardian. *See Lee,* 10 F.3d at 1551.[8]

▮▮▮ Moreover, the Court agrees with Ms. Vicker's construction of the provision.[9] Under Guardian's reasoning, if Shaun had worked every day including Friday, October 27th, but had only worked 7.5 hours on that Friday instead of eight hours, coverage would be denied. Guardian's reasoning is not sound and does not further the purpose of the ninety-day waiting period chosen by Amber. The 90–day waiting period, as well as the 30–hour per week requirement, was obviously designed to ensure that only full-time, permanent employees would be eligible for group insurance. Shaun clearly satisfied those conditions.

By all accounts, Shaun was an active, full-time employee who routinely worked at least thirty hours each week as required

---

**8.** At the hearing, Guardian argued that Ms. Vickers' reading of the provision creates two classes of coverage——those whose schedules were changed as a result of an accident and obtained insurance coverage on the effective date, and those whose insurance coverage became effective the next day they returned to work following their effective date. However, it is not Ms. Vickers' construction of the policy that creates two classes, but rather, it is the policy language itself. Under this Court's interpretation of the plain language of the policy, Guardian created two classes of employees: 1) those whose effective dates fell on regular work days; and 2) those whose effec-

tive dates fell on weekends or holidays. Under the first classification, if the employee was not at work on the effective date, coverage would be postponed until he returned to work. Under the second classification, coverage would begin on the effective date so long as the employee was at work on "his last regularly scheduled work day." Guardian conceded this point at the hearing.

**9.** The cases cited by Guardian are inapplicable to this case because they deal with construction of the phrase "actively at work." Here, the ambiguity involves the phrase "his last regularly scheduled work day."

under the plan and in fact worked twenty-seven hours in the three days before his accident. Further, Shaun was not scheduled to work on October 26th and 27th, and did in fact work more than his scheduled hours on October 25th. Accordingly, Guardian's interpretation of the plan is wrong as that term is used by the Eleventh Circuit. Despite finding that Guardian's interpretation of the plan is wrong, this Court finds that Guardian's interpretation is reasonable.

 Having determined that Guardian's interpretation is reasonable, the Court must determine whether Guardian suffered from a conflict of interest in order to determine whether the Court must apply the heightened arbitrary and capricious standard to Guardian's decision. Ms. Vickers argues that Guardian does indeed suffer from an inherent conflict of interest because Guardian, as the plan fiduciary, pays claims to beneficiaries from its own assets. In response, Guardian contends that it does not have any profit motive because it is a mutual fund insurance company [10] with no shareholders and it pays its profits to its policy holders as dividends. Guardian has submitted the affidavit of Lorraine Hayes, Chief Claims Advisor for Guardian in support of its argument, which asserts that Guardian pays claims from premium revenue and to the extent that expenses and claims exceed premium revenue, the balance is paid out of the premi-

um surplus; ie. prior retained earnings. If the premium surplus exceeds certain predetermined levels, the excess amounts are paid out as dividends.

Although Guardian has not submitted its bylaws, charter, or articles of incorporation, it has informed the Court that the dividends it purportedly pays to policyholders are distributed at the discretion of the Board of Directors as evidenced by its failure to pay dividends during the five-year tenure of Amber's policy. (Hayes supp. affid.; Becknell supp. affid.). Under the applicable law, the Guardian policyholders have no property interest in the policyholder surplus and no trust relationship is created, despite Guardian's arguments.[11] Accordingly, Guardian's decision not to pay benefits would only benefit policyholders if the surplus was actually distributed. Under the facts here, the direct benefit is to Guardian and its officers, board of directors, and employees by virtue of Guardian's continued existence. *Pitman v. Blue Cross and Blue Shield of Okla.*, 217 F.3d 1291, 1296–97 (10th Cir. 2000) (citing *Lee*, 10 F.3d at 1552 ("[C]orporate officers have incentives to maintain an economically healthy and successful company in order to ensure the viability and competitiveness of the company for the sake of their own job stability.").

 This Court finds that Ms. Vickers has met the burden of establishing that Guardian has a conflict of interest.[12] Ac-

---

**10.** Mutual insurance is "[a] system of insurance whereby the policyholders become members of the insurance company, each paying premiums into a common fund from which each can draw in the event of a loss." Black's Law Dictionary (7th ed.1999); 2 Couch on Insurance § 19.14 (2d ed.1983).

**11.** With the possible exception of mutual companies whose annual dividends are mandated by New York statute, the right to receive a dividend when declared creates no trust or property interest of the policyholder in the surplus. *Methodist Hosp. of Brooklyn*

*v. State Ins. Fund*, 64 N.Y.2d 365, 486 N.Y.S.2d 905, 476 N.E.2d 304, 308 (1985) (citations omitted). Here, New York law on mutual insurance controls because Guardian is a mutual insurance company incorporated in New York and issues dividends at the discretion of the Board of Directors. *Id; see also* Fla. Stat. §§ 628.011, 628.341(2).

**12.** Compare *Lee*, 10 F.3d at 1552 (involving a non-profit insurance corporation and concluding that both a conflict of interest existed and the insurance company's decision to deny benefits was tainted by self-interest because

cordingly, this Court must apply the heightened arbitrary and capricious standard to Guardian's interpretation of the plan provision. "Once a conflict of interest is established [by the plaintiff], the burden shifts to [the fiduciary] to prove that its interpretation of the plan was not tainted by self-interest." *Lee*, 10 F.3d at 1552 (citing *Brown*, F.2d at 1566–67). Although the existence of a profit motive is one factor to consider in determining a fiduciary's self-interest, it is not necessarily dispositive. *Id.* Rather, other factors must also be considered. *Id.*

Ms. Vickers argues that the Eleventh Circuit's opinion in *Lee* is dispositive on the issue of self-interest. In *Lee*, the Eleventh Circuit noted that a non-profit insurance corporation's "desire to maintain competitive rates while providing optimum benefits would require it to reject marginal claims. If [the insurance company] paid every claim submitted to it, its premiums would skyrocket. The fact that it does not pay every claim indicates that some form of self-interest, whether profit or the company's continued existence and success, is at work." *Id.*

On behalf of Ms. Vickers, Ms. Becknell avers in her supplemental affidavit that Amber chose Guardian for its employee's benefits plan because of its competitive pricing. Based on the evidence and argument presented to the Court, this Court concludes on the rationale of *Lee* that although Guardian may be a mutual company which lacks the traditional profit motives for its existence, "it still has a financial interest in denying claims in order to remain economically viable as well as competitive within the insurance industry." *Id.* at 1552. Accordingly, Guard-

ian's decision to deny Ms. Vicker's claim does not survive scrutiny under the heightened arbitrary and capricious standard as Guardian's decision is tainted by self-interest.

## V. CONCLUSION

Based on the foregoing reasons, it is therefore

**ORDERED** and **ADJUDGED** that Defendant's Motion for Summary Judgment (Doc. 15) is **DENIED** and Plaintiff's Cross Motion for Summary Judgment (Doc. 23) is **GRANTED.**

the company, despite its corporate form, had a financial interest in denying claims in order to remain economically viable as well as competitive within the insurance industry) with *Cagle v. Bruner*, 112 F.3d 1510, 1516 (11th Cir.1997) (involving a non-profit insurance entity where claim benefits were paid out of a "trust fund" established and funded by the policyholder members and concluding that no conflict of interest existed).