Frankie **WHITE** and Leon Warner, individually and on behalf of all others similarly situated, Plaintiffs,

v.

**THE COCA–COLA COMPANY,**
Defendant.

**CIV. A. No. 1:06–CV–1118–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 2, 2007.

Kenneth Behrman, Lenner, Schatten & Behrman, LLC, Atlanta, GA, for Plaintiffs.

Darren A. Shuler, David Tetrick, Jr., Joseph P. Rockers, King & Spalding, LLP, Atlanta, GA, for Defendant.

*ORDER*

ORINDA D. EVANS, District Judge.

This putative class action has been brought by individual Plaintiffs, Frankie White and Leon Warner, against The Coca–Cola Company ("Coca–Cola"). White and Warner seek to recover long term disability benefits under an employee welfare benefit plan, sponsored by their employer, Coca–Cola, and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). The case is presently before the Court on Plaintiff White's Motion for Partial Summary Judgment [Doc. 17], Defendant the Coca–Cola Company's Cross Motion for Summary Judgment on All of Plaintiffs' Claims [Doc. 20], Plaintiffs' Motion and Brief to Compel Discovery [Doc. 23], Plaintiffs' Motion and Brief in Support of Class Certification [Doc. 24], and Defendant the Coca–Cola Company's Motion for Leave to File Supplemental Motion for Summary Judgment on Plaintiff Leon Warner's Claims [Doc. 34].

For the following reasons, Plaintiff White's Motion for Partial Summary Judgment [Doc. 17] is DENIED, Defendant's Motion for Summary Judgment [Doc. 20] is GRANTED, Plaintiff's Motion to Compel [Doc. 23] is DENIED, Plaintiffs' Motion for Class Certification [Doc. 24] is DISMISSED AS MOOT, and Defendant's Motion for Leave [Doc. 34] is DISMISSED AS MOOT.

## I. *Factual Background*

Unless otherwise noted, the following facts are undisputed.

### A. *Operation of the Plan*

Coca–Cola is the Sponsor and Administrator of the Long Term Disability Plan of The Coca–Cola Company ("Plan"). Pursuant to the Plan document, Coca–Cola delegated certain of its powers as Plan Administrator to the Long Term Disability Income Plan Committee, which was dissolved effective January 1, 2003, and replaced by The Coca–Cola Company Benefits Committee ("Committee"). The Plan document grants the Committee exclusive responsibility and final discretionary authority "to construe the Plan and decide all questions arising under the Plan." [Plan Doc. § 7.2(b)(2) ]. Specifically, the Committee is given the authority "to determine the eligibility of Participants to receive benefits and the amount of benefits to which any Participant may be entitled under the Plan." *Id.* at § 7.2(b)(3).

According to Coca–Cola, plan participants with Disability Dates prior to January 1, 2003 are paid from the Trust Forming a Part of the Coca–Cola Company Long Term Disability Income Plan ("Trust"), which is funded by periodic, irrevocable payments. Coca–Cola claims that these plan participants are not, and have never been, paid from Coca–Cola's general assets. The Trust qualifies as a Voluntary Employees' Beneficiary Association ("VEBA") under Internal Revenue Code § 501(c)(9). However, filings with the IRS from 2003 and 2004 reflect that funds for disability claims are also paid out of general assets.

Pursuant to the Plan, the default monthly benefit is equal to 60% of the participant's Average Compensation, which is defined by the Plan. The Plan provides an offset for participants who also receive Social Security disability insurance ("SSDI") benefits. Specifically, § 4.2 of the Plan document, entitled "Offset for Other Disability Benefits" ("Offset Provision") states that:

The monthly Disability benefit payable from this Plan to the Participant who receives disability benefits from any source described in Subsection (b) [including Social Security disability benefits] will be reduced as necessary so that the total of his monthly Disability Benefit from this Plan equals no more than the following amount:

(1) 70 percent of his Average Compensation ..., minus

(2) the amount of his monthly disability benefits payable from all other sources;

provided that the difference will not exceed 60 percent of his Average Compensation as limited by the $200,000 (indexed) limitation described in Section 1.4; and provided further that the offset for other disability benefits will not serve to reduce the Disability Benefit under this Plan to an amount less than 60 percent of the Participant's Average Compensation as limited.

[Plan Doc. § 4.2(a) ]. The Summary Plan Description ("SPD") for the Plan provides the following example of the operation of the Offset Provision:

LTD payment example

Suppose your basic monthly pay for disability purposes is $3,000 and you do not receive benefits from other sources.

Here's how your LTD payment is figured:

| | | |
|---|---|---|
| $ | 3,000 | Basic monthly pay before disability |
| x | 60% | Maximum LTD pay replacement percentage |
| $ | 1,800 | Maximum monthly benefit from the LTD plan If you begin receiving a $750 in monthly Social Security disability payments, your LTD benefit will be reduced as follows: |
| $ | 3,000 | Basic monthly pay before disability |
| x | 70% | Maximum pay replacement percentage from all sources |
| $ | 2,100 | Total amount of your pay to be replaced by all sources |
| - | [$]750 | Monthly Social Security disability payment |
| $ | 1,350 | Actual monthly benefit from the LTD plan |

As the above example shows, the LTD Plan works with Social Security disability payments to bring your monthly income to 70% of your basic monthly pay.

\*\*\*

Since the LTD Plan benefit combined with other sources of LTD benefits cannot exceed 70% of your basic monthly earnings, the LTD plan benefit would be reduced as necessary.

[Long Term Disability Summary Plan Description [1] at 4].

With respect to SSDI benefits, § 3.4(d) of the Plan document provides that disability payments from the Plan will cease if the SSDI benefits "equal[ ] or exceed[ ] 70 percent of [the Participant's] Average Compensation." The SPD states, in a subsection titled "When benefits stop," that "[i]f the income you receive from Social Security ... or other sources of disability benefits is equal to or more than 70% of your basic monthly earnings, payments from the ... [P]lan will end." [SPD at 7].

The Plan document states that, "[i]f the Participant receives a retroactive payment of a disability benefit ..., the benefit will be considered to have been paid throughout the period for which it is payable." [Plan Doc. § 4.2(d) ]. Furthermore,

---

1. All citations to the Summary Plan Description are to the 2005 version of the SPD. However, contrary to certain of Plaintiffs' Response to Coca–Cola's Statement of Undisputed Material Facts, all quoted language from the SPD appears in the 2005, 2001 and 1995 versions of the SPD [See Pl. Resp. to Undisputed Facts, at ¶¶ 20–21]. In other words, the relevant portions of the SPD have remained unchanged during all times at issue in this lawsuit. Only the page numbers have changed on occasion.

§ 4.2(e) of the Plan ("Recoupment Provision") provides that, "[a]ny overpayment of Disability Benefits arising under Subsection ... (d) will be deducted from the Participant's future payments [from the Plan]." The SPD also addresses the issues of overpayment and retroactive benefits. First, "[i]f your LTD plan benefits are overpaid for any reason, you will be required to reimburse the third party administrator for the overpayment. Your benefits will be reduced or stopped until the overpayment is recouped." [SPD at 5]. Finally, the SPD states that, "[i]f any other benefits coordinated with LTD benefits are awarded retroactively, they will be treated as having been received by you during the entire time period for which such benefits were payable and any overpayment of any program benefits will be calculated accordingly." *Id.* at 14.

### B. *Background on White's Claims*

White became disabled in 1999 and received long term disability benefits pursuant to the Plan from August 1999 through July 2004. White's benefits totaled $1720.15 per month, which equaled 60% of his Average Compensation. On July 31, 2004, Liberty Life Assurance Company of Boston ("Liberty Life"), the Plan's administrative services provider, terminated White's disability benefits. White disputed the termination of his benefits through the administrative appeals process and, in November 2005, White's benefits were reinstated retroactive to July 30, 2004 by the Committee.

In July 2005, while his administrative appeal was ongoing, White was approved for SSDI benefits by the Social Security Administration in an amount of $1442.10 per month, retroactive to November 2001. In order to pay his retroactive benefits, White was given a lump sum award of $38,124.90 in SSDI benefits. Coca–Cola learned of the Social Security benefits in August 2005.

Upon resuming monthly benefit payments to White, Liberty Life applied the Offset Provision and reduced his payments to 70% of his Average Compensation ($2,006.85) minus his monthly SSDI benefits ($1442.00). Accordingly, White's monthly benefit from the plan was $564.85. Liberty Life also applied the Recoupment Provision to recover what it claimed were overpayments of Plan benefits for the period of time during which White received 60% of his Average Compensation, instead of 70% of Average Compensation minus the retroactive SSDI benefits. These alleged overpayments equaled $1,155.30 per month, for a total of $38,124.90 over the 33–month period covered by the retroactive SSDI award. The amount was reduced by $5,300 in attorney's fees that White was awarded in his SSDI letter, leaving a total alleged overpayment of $32,824.90 in Plan benefits. Liberty Life began recovering the overpayment by reducing White's monthly benefits by approximately $500 per month, and planned to do so for approximately 60 months.

White submitted a written appeal of the application of the Offset Provision and the Recoupment Provision directly to the Committee. On appeal, White argued that the last clause ("Proviso Clause") at the end of Offset Provision, which states, "provided further that the offset for other disability benefits will not serve to reduce the Disability Benefit under this Plan to an amount less than 60 percent of the Participant's Average Compensation as limited," creates a "60% floor" on Plan benefits and prohibits offsetting benefits to account for the receipt of SSDI benefits. White also argued that even if the Plan did permit offset of future benefits based on receipt of SSDI benefits, recoupment of overpayment of past Plan benefits by reducing future benefits for a limited time was prohibited.

The Committee retained outside counsel, Patrick DiCarlo, to evaluate White's claims and prepare a legal opinion regarding the Plan provisions at issue. DiCarlo delivered his analysis and opinion ("DiCarlo Report") to the Committee on April 12, 2006. The DiCarlo Report determined that because of the inconsistency created by the Proviso Clause, the Offset Provision was ambiguous on its face. Based on its analysis, the DiCarlo Report stated that the Committee could interpret the Plan as permitting. offset below 60% of Average Compensation and recovery of overpayment based on a retroactive SSDI benefit award. The Committee adopted the DiCarlo Report's interpretation of the Plan and unanimously voted to deny White's claim for additional benefits. DiCarlo drafted a letter explaining the Committee's final determination and reasoning, and the letter was issued to White on April 28, 2006. The instant lawsuit was filed on May 10, 2006.

### C. *Background on Warner's Claims*

Warner was initially approved for disability benefits in March 2000. On October 15, 2002 Warner was informed that based on Social Security benefits that began in October 2000, Coca–Cola was retroactively applying the offset provision and seeking return of overpayment. ING, the plan administrator at the time, applied the same formula to Warner's claims as was applied to White's claims and determined that Warner was overpaid $26,471.70. Warner's benefits were reduced by approximately $500 per month, and according to Warner, the full amount has been recovered. Unlike White, Warner did not file an administrative claim with Coca–Cola regarding the application of the offset provision.

· Coca–Cola moved to dismiss Warner's claims as barred by the explicit time limi-

tations of the Plan [Doc. 6]. In an Order dated March 30, 2007, the Court denied Coca–Cola's Motion to dismiss because there was no evidence that the documents containing the time limitation at issue were ever provided to Warner in compliance with the regulations governing changes to ERISA plans. [Doc. 32].

### II. *Standard for Summary Judgment*

The Court will grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the non-moving party's case. *Id.* at 248, 106 S.Ct. 2505.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). When the non-moving party bears the burden of proof at trial, the moving party's initial burden is to negate an essential element of the non-moving party's case or to show that there is no evidence to prove a fact necessary to the non-moving party's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991). When the moving party bears the burden of proof at trial, it "must demonstrate that 'on all the essential elements of its case on

which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.'" *Irby v. Bittick,* 44 F.3d 949, 953 (11th Cir.1995) (quoting *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1438 (11th Cir.1991)).

Only after the moving party meets this initial burden does any obligation on the part of the non-moving party arise. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *Chanel, Inc. v. Italian Activewear of Florida,* 931 F.2d 1472, 1477 (11th Cir.1991). At that time, the non-moving party must present "significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* If the non-moving party fails to do so, the moving party is entitled to summary judgment. *Four Parcels of Real Prop.,* 941 F.2d at 1438.

All evidence and justifiable factual inferences should be viewed in the light most favorable to the non-moving party. *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1532 (11th Cir.1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Four Parcels of Real Prop.,* 941 F.2d at 1438 (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

IV. *Cross–Motions for Summary Judgment*

White initially moved for "partial summary judgment" on two issues. First,

White argues that the Plan provides a 60% floor for disability benefits. Second, White argues that even if Coca–Cola can offset monthly disability benefits on the basis of SSDI benefits, Coca–Cola is prohibited from recovering alleged overpayments of disability payments on the basis of a retroactive lump sum payment of SSDI benefits. In response, Coca–Cola has moved for summary judgment on the same issues raised by White, and has also moved for summary on Warner's claims, which are identical to those raised by White. Accordingly, the Court will treat the motions as cross motions for summary judgment on all claims.

A. *The 60% Floor for Plan Benefits*

At the outset, the Court notes that there have been two decisions by courts in the Eleventh Circuit addressing the 60% floor limitation in the Plan. In *Oliver v. The Coca–Cola Company,* the United States District Court for the Northern District of Alabama determined that there was a 60% floor limitation based on a *de novo* review of benefits denial and general principles of contract law. 397 F.Supp.2d 1327, 1330 (N.D.Ala.2005). In *Byars v. The Coca–Cola Company,* Judge Thrash permitted benefits payments to be offset below 60% of Average Compensation without comment.[2] Civil Action No. 1:01–cv–3124–TWT, Docket # 229 (N.D.Ga. Sept. 27, 2006). Both cases are presently on appeal to the United States Court of Appeals for the Eleventh Circuit.

Plaintiffs claim that the Plan clearly discloses a 60% floor on disability benefits. Specifically, Plaintiffs rely on the Proviso Clause at the end of the Offset Provision in

---

**2.** The Court understands that Judge Thrash found for the plaintiff in *Byars,* but that finding is irrelevant to the instant action.

§ 4.2(a), which states that "the offset for other disability benefits will not serve to reduce the Disability Benefit under this Plan to an amount less than 60 percent of the Participant's Average Compensation as limited." Accordingly, Plaintiffs argue that the Committee's determination of their monthly disability benefits from the Plan are incorrect, because they receive less than 60% of their Average Compensation. Coca–Cola responds that the Plan does not contain a 60% floor on benefits, and that it has correctly applied the formula for offsetting disability benefits from other sources to White and Warner.

There is no standard for reviewing decisions of plan administrators or fiduciaries provided in ERISA. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The United States Court of Appeals for the Eleventh Circuit uses one of three distinct standards for reviewing administrators' plan interpretations and decisions:

(1) *de novo* where the plan does not grant the administrator discretion [i.e., does not exercise discretion in deciding claims;] (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest.

*Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1134 (11th Cir.2004) (quoting *HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir.2001)). The Eleventh Circuit has further refined the approach "for use in virtually all ERISA-plan benefit denials," including those based on plan interpretations, as follows:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is *"de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is *"de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Id.* at 1139 (internal citations omitted). Although Coca–Cola asserts that the Court should first determine the applicable standard of review, both parties apply the *Williams* framework to the Committee's benefits determinations.[3]

---

**3.** The Eleventh Circuit has not consistently applied the *Williams* framework, instead at times stating that the first step in the analysis should be a determination of "which standard to apply in reviewing the claims administrator's benefits decision." *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232. *Tippitt* cites *HCA* for the remaining steps of the analysis. *Id.* In *Williams*, the court explicitly "recapitulate[d]" the approach set out in *HCA* "in a simpler version." 373 F.3d at 1137. The Court finds that in the instant action, following the *Williams* framework resolves the question of which standard of review should be applied and resolves the dispute over the Committee's benefits determinations.

### 1. Was the Committee's Interpretation De Novo Wrong?

█ The Court must first determine whether the Committee's interpretation of the Offset Provision, permitting offset of benefits below 60% of Average Compensation is *de novo* wrong. Plaintiffs argue that the plain terms of the Plan are unambiguous and the Proviso Clause clearly indicates the presence of a 60% floor on benefits. In the alternative, Plaintiffs claim that if the terms are ambiguous, the principles of *contra proferentum* would apply. Pursuant to *contra proferentum*, ambiguous terms in the Plan should be construed against Coca–Cola as the drafter of the document. In response, Coca–Cola asserts that the Plan is ambiguous on its face, but concedes that the Committee's interpretation of the Offset Provision may be found *de novo* wrong on the basis of *contra proferentum*.

The Court finds that the Plan is internally inconsistent and ambiguous on its face. Section 4.1(b) provides that "no participant can receive a monthly benefit from this Plan in excess of 60% of his Average Compensation...." However, the Offset Provision calculates disability benefits by starting with 70% of Average Compensation and subtracting the amount of disability benefits from other sources. [Plan Doc. Section 4.2(a)]. Finally, the Offset Provision states both that the difference cannot exceed 60% of Average Compensation and that "the offset for other disability benefits [can]not serve to reduce the Disability Benefit under this Plan to an amount less than 60% of the Participant's Average Compensation." *Id.* The only way to reconcile the 60% cap of Section 4.1(b) with the 60% floor of Section 4.2(a) is to award benefits at exactly 60%. However, such a result would render the explicit language of the Offset provision, awarding 70% of Average Compensation minus other disability benefits, meaningless.

The other potential reading of the terms would be to start with the Offset Provision and award 70% of Average Compensation minus other disability benefits. However, this formula conflicts with either the 60% Cap of both Section 4.1(b) and 4.2(a) or the 60% Floor of Section 4.2(a). The Plan is patently ambiguous with respect to the 60% Cap, 60% Floor and Offset Provision.

█ As Coca–Cola concedes, however, the doctrine of *contra proferentum* supports a finding that the Committee's interpretation of the Offset Provision was *de novo* wrong. Pursuant to Eleventh Circuit precedent, ambiguities in ERISA plans are construed against the drafter of the document, and the claimant's interpretation is viewed as correct. *Lee v. Blue Cross/Blue Shield of Alabama,* 10 F.3d 1547, 1551 (11th Cir.1994). Accordingly, the Court finds that the Committee's interpretation, permitting offset of benefits below 60% of Average Compensation, is *de novo* wrong.

### 2. Was the Committee Vested with Discretion?

Turning to the second step in the Williams analysis, the Court must determine whether the Committee was vested with discretion in reviewing claims and interpreting the plan. Plaintiffs claim that they "cannot agree which standard of review should be made by this Court," and specifically assert in their Motion for Summary Judgment that the discretion of the Committee is unclear. [Pl. Mot. for Summary Judgment, 7–8]. However, in their Response to Coca–Cola's Motion for Summary Judgment, Plaintiffs concede that "the Plan grants the Committee complete and final discretionary authority to construe the [P]lan and decide all questions arising under the [P]lan and specifically to determine the eligibility of participants to receive benefits and the amount of benefits

to which any participant may be entitled under the plan...." [Pl. Resp., 7].

Plaintiffs assert that despite any explicit grant of discretion to the Committee, such discretion should not be recognized in the instant action because: (1) the SPD and administrative booklets do not grant the Committee discretion in interpreting plan terms; (2) John Howland, a member of the Committee was involved in both the initial denial of benefits and the administrative appeals process; (3) the Committee was incapable of fairly construing a contract drafted and amended by the Committee or Coca–Cola; and (4) the Committee had prejudged White's appeal. In response, Coca–Cola argues that the Plan's explicit grant of discretion to the Committee is not overcome by any of Plaintiffs' arguments.

As Plaintiffs concede in both their Response to Coca–Cola's Statement of Undisputed Facts and Response to Coca–Cola's Motion for Summary Judgment, § 7.2(b) of the Plan grants complete and final discretionary authority "to construe the Plan and decide all questions arising under the Plan," and "to determine the eligibility of Participants to receive benefits and the amount of benefits to which any Participant may be entitled under the Plan." Accordingly, unless Plaintiffs are correct in one of their four arguments, the Committee is entitled to deference and its decision will be reviewed under either the arbitrary and capricious standard or the heightened arbitrary and capricious standard.

### a. Conflict Between the Plan and SPD

■ First, Plaintiffs argue that although the Plan Document grants the Committee complete and final discretion regarding plan interpretation, the SPDs and Administrative booklets do not contain a grant of discretionary authority over plan interpretation. The SPD provides that the Committee "has sole authority to review and make determinations on all claims for benefits and all decisions of the [Committee] will be final and binding on all affected parties." [White Claim File, Ex. 1 to Gilbreath Aff., at Coca–Cola 000314]. Plaintiffs argue that the lack of explicit language related to plan interpretation in the SPD creates a conflict with the Plan. Furthermore, Plaintiffs claim that they relied on the SPDs, and that the inconsistency between the Plan and the SPD should be resolved by finding that the SPD, which is silent on plan interpretation, should control.

■ The Eleventh Circuit does not require that discretionary language be contained in the SPD. Cagle v. Bruner, 112 F.3d 1510, 1517 (11th Cir.1997). Rather, courts are directed to "look to all of the plan documents to determine whether the plan affords the [plan administrator] enough discretion to make the arbitrariness standard applicable." Id. A difference in language between the Plan Document and the SPD does not necessarily create conflict. Liberty Life Assur. Co. of Boston v. Kennedy, 358 F.3d 1295, 1301 (11th Cir.2004). A conflict exists:

if the employee were somehow misled by the Summary Plan Description, which is a document intended to be accurate and comprehensive and which reasonably apprises an employee of his or her rights under the Plan.

McKnight v. S. Life & Health Ins. Co., 758 F.2d 1566, 1570 (11th Cir.1985).

■ Before a court can "prevent an employer from enforcing the terms of a plan that are inconsistent with those of the plan summary, a beneficiary must prove reliance on the summary." Branch v. G. Bernd Co., 955 F.2d 1574, 1579 (11th Cir. 1992). If a plan participant proves reasonable reliance on an SPD, the terms of the SPD will prevail over the terms of the Plan. McKnight, 758 F.2d at 1570. Fur-

thermore, "reliance is only relevant when an estoppel principle is present, such as when an employee asserts he or she is entitled to benefits under the language of a summary plan description and the employer contends that a plan document controls and precludes benefits." *Liberty Life,* 358 F.3d at 1302.

The Court finds that the difference between the discretion-granting language of the Plan document and the SPD does not create a conflict. The grant of discretion to the Committee to interpret the plan contained in the Plan document and the lack of such a grant in the SPD are not irreconcilable. *See id.* at 1300. Furthermore, even were the Court to find that there was a conflict between the Plan and the SPD, Plaintiffs have failed to prove reliance on this conflict. The only reference to reliance made by Plaintiffs appears in the affidavits that accompany the Complaint, wherein both Plaintiffs assert that they "read the Summary Plan Description and administrative booklet concerning long term disability and relied on same." [White Aff., ¶ 4; Warner Aff., ¶ 4]. There are no details about how exactly Plaintiffs relied on the SPD, and there are no principles of estoppel implicated by the question of plan interpretation. Accordingly, Plaintiffs cannot overcome the grant of authority and discretion over plan interpretation contained in the Plan on the basis of a conflict with the SPD.

### b. *Inherent Procedural Irregularities*

According to Plaintiffs, the most important reason to set aside the Committee's exclusive discretion is on the basis of "inherent procedural irregularities in Coca–Cola's administrative appeal system...." [Pl. Resp. at 8]. Specifically, White contends that John Howland, a member of the Committee, participated in both the initial decision and the final administrative appeal, in violation of 29 C.F.R. §§ 2560.503–1(h)(3)(ii) and (4). Warner argues that

ING, the third-party administrator at the time his benefits were offset, violated 29 C.F.R. § 2560.503–1(g)(iv) by failing to mention that he could administratively appeal the decision to offset his benefits and recoup retroactive overpayments.

In support of his argument, White relies on e-mails sent by John Howland regarding White's benefits. Specifically, White quotes the following, which he claims was part of an e-mail to Liberty Mutual:

if we reinstate [White's] LTD benefit beginning August 1, 2004, that is a period of 15 months (August 2004 to October 2005) that we would otherwise owe him. This comes to a total of $8,470.90 which is subtracted from his retroactive award balance he "owes" us, leaving a balance of $24,352.00. If we divide 24,352/564.86 that comes to 43.11, which means if he is unable to pay us back any of the $34,352 now, we would not pay him any LTD for the next 43 months, beginning in November, 2005.

[Pl. Resp., Ex. 3, at 5]. According to White, after receiving Howland's e-mails, Liberty Life sent letters to White on December 1, 2005 and February 8, 2006 concerning the offset and retroactive recoupment. [Pl. Resp., Ex. 4]. Finally, Howland, in his capacity as a member of the Committee, voted to uphold Liberty Life's initial decision, and seconded the motion to deny White's disability claim. Warner's argument is based solely on the fact that the letter from ING, informing Warner of the offset and recoupment, did not provide Warner with notice that he could administratively appeal the decision.

The only case law referenced by Plaintiffs is *Torres v. Pittston Company,* wherein the Eleventh Circuit stated:

The Labor Department has taken the position that a denial occurring without the minimum procedural safeguards provided in the ERISA statutes and regula-

tions should not be reviewed deferentially. In adopting the version of the "deemed denial" regulation that applies to Torres' claim (based on its date of filing), the Labor Department said that, where an ERISA plan administrator denies benefits without providing a timely and complete notice of decision comporting with ERISA requirements, "[i]t is the Department's view that, in such a case, any decision that may have been made by the plan with respect to the claim is not entitled to the deference that would be accorded to a decision based upon a full and fair review that comports with the requirements of (the ERISA statute)."

346 F.3d 1324, 1333 n. 11 (11th Cir.2003) (internal citations omitted). However, Plaintiffs have removed any reference to the "deemed denial" regulation present in the quoted passage.

■ The Court finds that neither the evidence nor case law supports Plaintiffs' claims that the Committee is not entitled to deference because of procedural irregularities. First, with respect to White's claims, the e-mail from John Howland quoted by White appears to have been sent to Mary Williams, who, based on her e-mail address, is an employee of Coca–Cola, not Liberty Mutual. [Pl. Resp. Ex. 3, at 5]. Furthermore, in an unquoted portion of the e-mail that precedes the passage quoted by White, Howland states, "Liberty has calculated the total amount of his retroactive social security award as $32,824.90[.]" Id. This sentence indicates that the calculations Howland is providing to Williams, another employee of Coca–Cola, have been made by Liberty, not by Howland himself. In fact, the other e-mail on page 5 of the Exhibit, from Harriet Michael, a Liberty employee reveals that almost all of the calculations that White attributes to Howland originated with Liberty. Id. The letters that were ultimately sent by Liberty to White contain calculations that differ from those in Howland's e-mail, further indicating that Howland did not direct Liberty's calculations of the retroactive offset of White's claims.

■ With respect to Warner's claims that the letter from IGN [Pl. Resp., Ex. 5] violates 29 C.F.R. § 2560.503–1(g)(iv), the Court finds that the regulations at issue relate to the required procedure for the denial of a claim or the termination of plan benefits, neither of which are applicable. The ING letter clearly discloses the application of the Offset Provision and the intended recoupment of overpayments based on the retroactive award of SSDI benefits. Id. The regulation raised by Warner is an implementing regulation for 29 U.S.C. § 1133, which by its clear and unambiguous language applies only when a "claim for benefits under the plan has been denied." The ING letter discloses the operation of the Offset Provision and explains the means of recoupment for the overpayment, yet it is clear that Warner was still paid a monthly disability benefit. The benefit was offset by the SSDI benefit and was applied to recoup the money owed to Coca–Cola for retroactive overpayment, so the ING letter cannot be considered a denial of a claim for benefits that implicates § 1133 and the regulations cited by Warner. See Butler v. Aetna U.S. Healthcare, Inc., 109 F.Supp.2d 856, 864 (S.D.Ohio 2000) (finding § 1133 inapplicable to recoupment based on lump sum Social Security award).

Finally, Plaintiffs' selective quotation of Torres is unpersuasive. The Torres court explicitly referred to the Department of Labor's position regarding the adoption of the "deemed denial" regulation of ERISA. 346 F.3d at 1333 n. 11. Plaintiffs have removed the reference to the "deemed denial" regulation and stated that any "decision made in the absence of the mandated procedural protections should not be enti-

tled to any judicial deference." [Pl. Resp., at 10]. In fact, the *Torres* court did not make any holding regarding whether any "denial occurring without the minimum procedural safeguards provided in the ERISA statutes and regulations should not be reviewed deferentially." 346 F.3d at 1333. In *Brucks v. The Coca–Cola Company*, 391 F.Supp.2d 1193 (N.D.Ga.2005), Judge Duffey of this Court stated:

> [a]lthough *Torres* leaves open the possibility that an administrator's failure to comply with the procedural deadlines set out in the regulations may alter the otherwise-applicable standard of review, critical to the *Torres* court's discussion was the fact that the regulation at issue expressly stated that the administrator's failure to comply with a deadline resulted in the claim being "deemed denied."

*Brucks,* at 1201.

As in *Brucks,* the regulations that Plaintiffs claim were violated by Coca–Cola do not "expressly provide[ ] that a failure to comply with them results in a claim being deemed denied, nor do they otherwise indicate that such a failure affects the standard of review to be applied to the administrator's decision." *Id.* The alleged violations are relevant only in determining whether the Committee's decision was arbitrary and capricious, not to a determination of the proper standard of review, and do not justify obviating the express discretionary grant to the Committee. *Id.*

### c. *Fairness and Prejudgment*

■ Plaintiffs' last two grounds for not deferring to the discretion of the Committee are: (1) the Plan was drafted and amended by Coca–Cola and the Committee, and as "a matter of fairness, the Committee should not have been the decision maker"; and (2) the Committee had prejudged the offset issue, because it consistently followed the practice of offsetting social security benefits. [Pl. Resp., at 10–11]. Plaintiffs cite no case law to support these arguments, and the Court finds that the undisputed evidence that Coca–Cola consulted with outside counsel in determining White's administrative appeal mitigates any concerns about fairness and prejudgment. These arguments may be relevant to determining whether the Committee's decision was arbitrary and capricious, but do not warrant less judicial deference.

Accordingly, the Court finds that the Committee was vested with discretion in reviewing claims and interpreting terms of the Plan.[4]

### 3. *Are There Reasonable Grounds of Support for the Committee's Decision?*

■ Having determined that the Committee is entitled to judicial deference, the Court proceeds to the third step of the *Williams* framework—a review of the Committee's decision under the arbitrary

---

4. In *Oliver,* the court determined that the denial of a benefit claim was not entitled to judicial deference based on a finding that the administrative services provider at the time, Broadspire, was the "real decision-maker." 397 F.Supp.2d at 1321. In part, this finding was based on " 'the Committee's' knee-jerk concurrence in Broadspire's denial...." *Id.* at 1324. Plaintiffs have not alleged that anyone other than Coca–Cola was the real decision-maker with respect to their claims. The only "decision" regarding either Plaintiff's claims was made by the Committee in White's administrative appeal, and Plaintiffs do not dispute this fact. Unlike *Oliver,* neither party was denied benefits by the administrative services provider. Their benefits continued, albeit in an amount offset by SSDI benefits. Accordingly, the Court finds the *Oliver* real decision-maker analysis to be inapplicable to the instant action.

and capricious standard to determine whether "reasonable" grounds support it.

Plaintiffs argue that the plain language of the Proviso Clause discloses the 60% floor for disability benefits. Furthermore, Plaintiffs assert that the Committee's use of extrinsic evidence in resolving the ambiguity of the Plan contravenes Georgia State contract law, specifically the principle of *contra proferentum.* In response, Coca–Cola argues that application of *contra proferentum* at this step in the Williams framework is inappropriate, and the facts support a finding that the Committee's decision was reasonable.

■■■ Plaintiffs cite at length numerous decisions regarding contractual interpretation under Georgia law. It is well-established that because ERISA "does not provide any guidance on how a court should interpret provisions in an employee welfare benefit plan," federal courts are authorized "to develop a body of federal common law to govern issues in ERISA actions not covered by the act itself." *Tippitt,* 457 F.3d at 1234–35. The federal common law of ERISA "may look to state law as a model because of the states' greater experience in interpreting insurance contacts and resolving coverage disputes." *Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1041 (11th Cir. 1998). However, the Eleventh Circuit has also made clear "that when a federal court construes an ERISA-regulated benefits plan, the federal common law of ERISA supersedes state law." *Buce v. Allianz Life Ins. Co.,* 247 F.3d 1133, 1142 (11th Cir.2001).

■■■ The Plan contains an express choice-of-laws provision, indicating that it will be construed in accordance with the laws of the State of Georgia. [Plan Doc. § 7.10]. Despite this explicit choice of law, however, "ERISA's preemptive authority sweeps broadly to preclude the application of provisions of state law (statutory or

decisional) that would undercut the uniform implementation of ERISA's text or its attendant case law." *Buce,* 247 F.3d at 1148. In *Buce,* there was a Georgia choice of law provision and the Eleventh Circuit applied the Georgia doctrine of "accidental means" to determine whether a death was accidental. *Id.* The Eleventh Circuit held that the "accidental means" doctrine could be applied because "[the court had] been pointed to no ERISA statutory language, and no cases formulating the common law of ERISA, which suggest that the agreement of the parties to utilize Georgia doctrine would be subversive of ERISA policy." *Id.*

With respect to the application of *contra proferentum,* the Eleventh Circuit has reached the opposite conclusion. In *HCA,* the case that established the framework that was refined in *Williams,* the court first acknowledged that *contra proferentum* is applicable to ERISA cases and that "[w]hen a plan is ambiguous, the principle of *contra proferentem* requires that ambiguities be construed against the drafter of a document; as such, the claimant's interpretation is viewed as correct." 240 F.3d 982, 994 n. 24 (11th Cir.2001). However, the court held that even where *contra proferentem* renders the claimant's interpretation of an ambiguous claim term correct, the claimant does not automatically prevail on an ERISA claim. *Id.* at 994. The court explained:

At first glance it seems odd that a reasonable interpretation would not automatically defeat a wrong interpretation. The reason the claimant's reasonable interpretation does not trump the claims administrator's wrong interpretation is because the plan documents explicitly grant the claims administrator discretion to interpret the plan. We cannot over emphasize the importance of the discretion afforded a claims administrator; the underlying premise of arbitrary

and capricious, rather than *de novo*, review is that a court defers to the discretion afforded the claims administrator under the terms of the plan. To find a claims administrator's interpretation arbitrary and capricious, the court must overcome the principle of trust law which states that a trustee's interpretation will not be disturbed if it is reasonable. Thus, the next step requires the court to determine whether the claims administrator's wrong interpretation is nonetheless reasonable. If the court determines that the claims administrator's wrong interpretation is reasonable, then this wrong but reasonable interpretation is entitled to deference....

*Id.* (internal citations omitted).

■■■ In other words, *contra proferentum* is applicable at the initial stage of the Williams framework, in order to determine whether the Committee's decision was *de novo* wrong. But *contra proferentum* would render the arbitrary and capricious standard meaningless if applied at the third step of the Williams framework where, as here, the Committee has been vested with discretion to interpret the Plan. Application of *contra proferentum* in the manner advocated by Plaintiffs would "be subversive of ERISA policy." *Buce,* 247 F.3d at 1148.

*Tippitt* does not hold otherwise. The district court in *Tippitt* had determined that a denial of benefits was *de novo* "right", rather than *de novo* "wrong" and did not proceed in its analysis beyond that determination. 457 F.3d at 1233. The Eleventh Circuit applied *contra proferentum,* to resolve the ambiguities against the plan drafter, and reversed the district court's finding that the denial of benefits was *de novo* "right". *Id.* at 1235. The case was remanded to the district court "to complete the remaining steps of the process...." *Id.* at 1238–39.

■■ If Plaintiffs are correct that *contra proferentum* applies throughout every step of the *Williams* framework, there would be no need to remand *Tippitt* to complete the rest of the process. Any plan participant who can show an ambiguity in an ERISA plan would automatically win on the basis of *contra proferentum,* and there would be no need for the well-established three-tiered review system for ERISA claims. *Cagle,* 112 F.3d at 1519 ("The 'reasonable interpretation' factor and the arbitrary and capricious standard of review would have little meaning if ambiguous language in an ERISA plan were construed against the [plan administrator].")). Although the Court agrees that, in general, "all words in a contract are to be given meaning" and "that any ambiguity in a contract is to be resolved against the draftsman," in the context of the clear framework for deciding ERISA cases laid out in *Williams,* such general principles of contract interpretation are inapplicable. *Oliver,* 397 F.Supp.2d at 1330.

■■■ In reviewing the Committee's interpretation, "[a]s long as a reasonable basis appears for [the] decision, it must be upheld as not being arbitrary and capricious." *Jett v. Blue Cross and Blue Shield of Alabama, Inc.,* 890 F.2d 1137, 1140 (11th Cir.1989). In making its determination regrading White's benefits, the Committee retained outside ERISA counsel to analyze the application of the Offset Provision and commissioned a report from said outside counsel. The Committee determined that the Plan was patently ambiguous because the Offset Provision, 60% floor and 60% ceiling created internal inconsistencies. After reviewing extrinsic evidence, such as the examples of the application of the Offset Provision in the SPD, the Committee determined that the Offset Provision was intended to function without a 60% floor. Including the 60% floor

would render the application of the Offset Provision meaningless, because benefits would have to equal exactly 60% of Average Compensation. Furthermore, the Committee recognized that there had been uniform application of the Offset Provision as outlined by the examples in the SPD and without a 60% floor on benefits.

Based on the undisputed facts, the Court finds that the Committee's interpretation of the Offset Provision was reasonable.

### 4. *Was There a Conflict of Interest?*

 Having found that reasonable grounds for the Committee's plan interpretation existed, the Court turns to the fourth step under *Williams,* a determination of whether the Committee operated under a conflict of interest. Plaintiffs argue that the funding structure of the Plan, as disclosed on two federal filings and in the administrative booklets for the Plan, as well as the discretion granted to the Committee to change, modify or amend the Plan at any time, create a conflict of interest. In response, Coca–Cola asserts that the fund is structured in such a way as to prevent any conflict of interest on the part of the Committee.

 In plan interpretation cases, such as this one, the Eleventh Circuit has adopted a two-step, burden-shifting, approach in addressing conflicts of interest. First, the claimant must show "that the administrator of a discretion-vesting plan is conflicted." *Williams,* 373 F.3d at 1138. Once the claimant makes this showing, the administrator must then "prove[ ] that his plan interpretation was not tainted by self-interest." *Id.* A wrong but apparently reasonable interpretation will be found arbitrary and capricious "if it advances the conflicting interest of the administrator at the expense of the claimant." *Id.* However, "if the administrator can demonstrate a routine practice or give other plausible

justifications . . . judicial deference to it may be granted. . . ." *Id.*

The Eleventh Circuit has held that no conflict of interest exists where "benefits are paid from a trust fund through periodic, nonreversionary contributions." *Buckley v. Metro., Life,* 115 F.3d 936, 939 (11th Cir.1997). Conversely, a conflict of interest has been found when an insurance company administers claims under a policy it issued, "[b]ecause an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual contact with its profit-making role as a business." *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1562 (11th Cir.1990). The *Brown* standard has been extended beyond the context of insurance companies, and the Eleventh Circuit applies heightened arbitrary and capricious review when beneficiaries are paid out of the general assets of the plan's fiduciary. *Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321, 1326 (11th Cir.2001).

In *Brucks,* Judge Duffey found that the "Plan benefits were paid from a trust which Coca–Cola funded through irrevocable, periodic contributions." 391 F.Supp.2d at 1200. Plaintiffs first argue that two annual forms filed with the IRS disclose that the benefits are actually paid from general assets of Coca–Cola. These forms, Form 5500 Annual Return/Report of Employee Benefit Plan, filed for the years 2003 and 2004 both indicate that the Plan is funded and benefits are paid from a trust and general assets. [Pl. Mot., Ex. 6, Lines 9a and 9b]. Furthermore, according to Plaintiffs, the fact that Administrative Information for SPDs states that "some of the plans are administered through insurance companies or other providers for an administrative fee, with benefits paid by the Company from its general assets," indicates that there is a conflict of

interest. [Gilbreath Aff., Ex. 1, at Coca–Cola 000343]. Finally, although Plaintiffs concede that any money in the trust cannot revert to Coca–Cola, the Committee may decide not to fund the trust at all.

In response, Coca–Cola relies on the Form 5500 filed for 2005, which only indicates funding and benefits through a Trust. [Gilbreath Aff. Ex. 18]. White's administrative appeal was decided during the period of time that the 2005 Form 5500 controlled the Plan. Furthermore, Coca–Cola has provided sworn testimony indicating that the Plan has never paid benefits from its general assets. [Gilbreath Aff., at ¶¶ 32–33]. The Administrative Information that Plaintiffs cite also explicitly discloses that, with respect to the Plan, the benefits of pre–2003 participants (such as White and Warner) are "funded through a trust to which the Company contributes." [Gilbreath Aff., Ex. 1, at Coca–Cola 000346]. Plaintiffs cannot claim that they relied on the information disclosed in the SPDs only where it is beneficial to their claims.

The Trust's qualification as a Voluntary Employees' Beneficiary Association ("VEBA") under the Internal Revenue Code § 501(c)(9) is also persuasive. The tax-exempt status conferred by VEBA recognition carries strict requirements preventing reversion of trust assets. In fact, courts have held that funding a benefits plan through a VEBA trust "minimize[s] a potential conflict of interest." *Smith v. Bayer Corp. Long Term Disability Plan*, 444 F.Supp.2d 856, 869 (E.D.Tenn.2006). Finally, as Plaintiffs concede, the Trust document plainly establishes that "in no event shall any part of the Trust Fund attributable to the Plan revert to Coca–Cola." [Gilbreath Aff., Ex. 8, § 8.02]. Plaintiffs cite to no cases indicating that the "periodic contribution" aspect of *Buckley* requires an explicit statement of when such contributions will be made.

Plaintiffs argue that at a minimum they are entitled to discovery as to how the plan is funded, and this argument is a significant component of the Motion to Compel Discovery currently before the Court. However, based on the evidence, the Court finds that the Plan is funded through periodic contributions to an irrevocable trust, and accordingly no conflict of interest can exist. Plaintiffs are not entitled to further discovery on this issue.

Accordingly, because the Court has found that the Committee's interpretation of the Plan was reasonable and the Committee did not have a conflict of interest, under the arbitrary and capricious standard Coca–Cola is entitled to summary judgment on the 60% floor and the application of the Offset Provision. The Court finds that the Plan does not disclose a 60% floor on benefits.

### B. *Recoupment of Overpayment*

█ Plaintiffs argue that even if the Court finds that there is not a 60% floor on benefits, Coca–Cola may not recover any alleged overpayment based on the retroactive award of SSDI benefits. According to Plaintiffs, Coca–Cola can neither establish that it overpaid Plaintiffs nor that it has a legal or equitable right to recover said overpayments. Coca–Cola responds that federal courts routinely permit plan administrators to recover overpayments resulting from retroactive awards of SSDI benefits.

Unlike the 60% floor dispute, the Committee did not interpret the provisions governing overpayment and recoupment. Rather, White did not request an interpretation of the provisions during his administrative appeal. Based on the *Williams* framework, it appears that Plaintiffs are attempting to argue that the application of the Recoupment Provision by the Commit-

tee was *de novo* "wrong", and entitled to no deference.

Specifically, Plaintiffs assert that "nothing in the Plan indicates Coca–Cola overpaid the Plaintiffs." [Pl. Mot., at 18]. However, the Plan document states that, "[i]f the Participant receives a retroactive payment of a disability benefit ..., the benefit will be considered to have been paid throughout the period for which it is payable." [Plan Doc. § 4.2(d) ]. Furthermore, § 4.2(e) of the Plan provides that, "[a]ny overpayment of Disability Benefits arising under Subsection ... (d) will be deducted from the Participant's future payments [from the Plan]." Based on the application of the Offset Provision, which has been found to not contain a 60% floor on benefits, the Committee determined that Plaintiffs had been overpaid as a result of the retroactive payment of SSDI. This determination is within the explicit provisions of §§ 4.2(d) and (e).

Plaintiffs contend that even if they were overpaid, Coca–Cola has no right to seek repayment. According to Plaintiffs, Coca–Cola cannot recover any overpayment from them because Coca–Cola would not be able to sue Plaintiffs under ERISA § 502(a)(3), which limits recovery to "appropriate equitable relief." *See Eldridge v. Wachovia Corp. Long–Term Disability Plan,* 383 F.Supp.2d 1367, 1370 (N.D.Ga. 2005). However, the present lawsuit was not instituted by Coca–Cola pursuant to § 502(a)(3), but rather Plaintiffs are seeking additional benefits pursuant to ERISA § 502(a)(1)(B). As such, it is Plaintiffs, not Coca–Cola who have the burden of proving that he is entitled to Plan benefits. *Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1040 (11th Cir.1998).

Plaintiffs also cite a recent decision by Judge Carnes of this Court, which they claim "indicates there is no difference between recoupments and offsets," and that Coca–Cola cannot recover anything from Plaintiffs. [Pl. Resp., at 22]. In *Smith v. Life Insurance Company of North America,* Judge Carnes found that despite plain language of a disability plan, the plan administrator was not entitled to offset monthly benefits as a result of a participant's tort recovery unless the participant has been "made whole" by the judgment. 466 F.Supp.2d 1275, 1285 (N.D.Ga.2006). The *Smith* decision was based, in part, on the fact that the Eleventh Circuit had expressly recognized the make whole doctrine as part of the federal common law with respect to ERISA claims. *Id.* (citing *Cagle,* 112 F.3d at 1521). *Smith* is specifically applicable to the context of tort recovery and the make whole doctrine, which are not implicated in the instant action.

Numerous courts have approved of the recoupment of retroactive SSDI awards. *See e.g., Butler,* 109 F.Supp.2d at 861; *Calloway v. Pacific Gas & Elec. Co.,* 800 F.Supp. 1444, 1448 (E.D.Tex.1992); *Spray v. UNUM Life Ins. Co.,* 749 F.Supp. 800, 806 (W.D.Mich.1989); *Lessard v. Metropolitan Life Ins. Co.,* 568 A.2d 491, 496–498 (Me.1989); *Stuart v. Metropolitan Life Ins. Co.,* 664 F.Supp. 619, 622–624 (D.Me.1987), aff'd per curiam, 849 F.2d 1534; *Henning v. Metropolitan Life Ins. Co.,* 546 F.Supp. 442, 449–449 (M.D.Pa. 1982); *see also Madden v. ITT Long Term Disability Plan,* 914 F.2d 1279, 1287 (9th Cir.1990); *Cooperative Benefit Adm'rs, Inc. v. Whittle,* 989 F.Supp. 1421 (M.D.Ala. 1997); *Greig v. Metro. Life Ins. Co.,* 980 F.Supp. 169, 171 (W.D.Va.1997). The Court of Appeals for the Seventh Circuit recently rejected Plaintiffs' exact argument by declining "to rule that plan provisions authorizing recoupment of unreimbursed overpayments by a plan fiduciary are contrary to the statutory structure and the underlying policies of ERISA." *Northcutt v. Gen. Motors Hourly–Rate Employees Pension Plan,* 467 F.3d 1031, 1036–37 (7th Cir.2006).

Accordingly, the Court finds that the Committee's determination of an overpayment based on a retroactive award of SSDI benefits, and the recoupment thereof through reduction of future benefits was permissible and *de novo* right. There is no need to proceed to the other steps of the *Williams* framework. Coca–Cola is entitled to summary judgment on this issue.

## V. *Motion to Compel Discovery, Motion to Certify Class, and Motion for Leave*

Plaintiffs have also filed a Motion to Compel Discovery and a Motion to Certify Class, and Coca–Cola has filed a Motion for Leave to File Supplemental Motion for Summary Judgment.

In the motion to compel, Plaintiffs assert that they are entitled to discovery on a number of issues, including the funding of the Plan and potential conflicts of interest based on decision-making capacity. Having determined that there was no genuine issue of material fact that the Committee was vested with discretion to interpret the plan, that its decisions were either *de novo* right or wrong but reasonable, and that no conflict of interest exists based on the funding of the Plan, the requested discovery is unnecessary.

Plaintiffs also allege that they are entitled to discovery on the method Coca–Cola used to notify participants of changes to the Plan. This issue was relevant to Coca–Cola's previously decided Motion to Dismiss, and in light of the Court's grant of summary judgment, this discovery is likewise unnecessary.

Accordingly, Plaintiffs' Motion to Compel Discovery is DENIED. Furthermore, based on the Court's grant of summary judgment to Coca–Cola, Plaintiffs' Motion to Certify Class and Coca–Cola's Motion for Leave to File a Supplemental Motion for Summary Judgment are DISMISSED AS MOOT.

## VI. *Conclusion*

For the foregoing reasons, Plaintiff White's Motion for Partial Summary Judgment [Doc. 17] is DENIED, Defendant's Motion for Summary Judgment [Doc. 20] is GRANTED, Plaintiff's Motion to Compel [Doc. 23] is DENIED, Plaintiffs' Motion for Class Certification [Doc. 24] is DISMISSED AS MOOT, and Defendant's Motion for Leave to File a Supplemental Motion for Summary Judgment [Doc. 34] is DISMISSED AS MOOT.

The Clerk is DIRECTED to enter judgment for Defendant, with costs taxed to Plaintiffs.